Joseph J. JACOBONI, Plaintiff,

v.

KPMG LLP, Defendant.

No. 6:02–CV–510–ORL22DAB.

United States District Court, M.D. Florida. Orlando Division.

March 11, 2004.

Frank A. Hamner, Esq., GrayRobinson, P.A., Orlando.

W.L. Kirk Jr., Esq., Rumberger, Kirk & Caldwell, P.A., Orlando.

Joseph Bernard Haynes, Esq., King & Spalding, Atlanta, GA.

## ORDER

CONWAY, District Judge.

### I. INTRODUCTION

This cause comes before the Court for consideration of a Report and Recommendation ("R & R") (Doc. 181) issued by the assigned Magistrate Judge on February 5, 2004. In the R & R, the Magistrate Judge recommended that Defendant KPMG LLP's Motion for Judgment on the Pleadings (Doc. 143) be granted in part and denied in part.[1] More particularly, the Magistrate determined that some, but not all, of the predicate acts underlying Plaintiff Joseph J. Jacoboni's federal racketeering ("RICO") claim are barred by Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA"),[2] 18 U.S.C. § 1964(c). Accordingly, the Magistrate Judge recommended that the motion be denied to the extent it seeks judgment on the pleadings, but granted insofar as it seeks to prohibit Jacoboni from relying on certain conduct to establish a RICO violation.

KPMG objects to the R & R, asserting that the PSLRA precludes the entirety of Jacoboni's RICO claim. *See* Doc. 184.[3] Accordingly, KPMG urges the Court to grant judgment in its favor on that claim. Additionally, KPMG asks the Court to decline to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), over Jacoboni's remaining claims, which all arise under Florida law. In response, Jacoboni argues that the Magistrate Judge's recommendations should be adopted. *See* Doc. 233. Jacoboni further asserts that even if the Court should grant KPMG a judgment on the RICO claim, it should retain jurisdiction over the state law claims.

Upon considering the R & R and the parties' submissions relating thereto, the Court determines that the PSLRA bars Jacoboni's entire RICO claim. According-

---

1. The R & R also contained recommendations concerning two other motions: KPMG's Motion for Summary Judgment (Doc. 155) and KPMG's Motion to Exclude the Expert Opinion of Bruce G. Dubinsky (Doc. 159). Given the Court's disposition of the R & R regarding KPMG's Motion for Judgment on the Pleadings, it is unnecessary to address the recommendations concerning the other two motions. In any event, no party has objected to the Magistrate Judge's recommended disposition of KPMG's Motion to Exclude.

2. Pub.L. 104–67, 109 Stat. 737 (1995).

3. KPMG also objects to the Magistrate Judge's recommendation that KPMG's summary judgment motion be denied. However, as previously stated, the Court need not address that recommended disposition.

ly, KPMG is entitled to judgment on that claim. Additionally, in its discretion pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Jacoboni's state law claims; those claims will be dismissed, with leave to refile them in state court.

## II. BACKGROUND[4]

As set forth in the operative Second Amended Complaint (Doc. No. 84),[5] as a result of a sale of stock, Jacoboni faced approximately $28 million in federal income tax capital gains liability in 1997. After being referred to KPMG by his banker, Jacoboni decided to enter into an investment strategy (referred to as "FLIP") proposed by KPMG. According to the allegations, KPMG represented the strategy as a "no lose" proposition in that he would either make money or any losses incurred would offset the 1997 capital gains for federal income tax purposes. KPMG represented that Jacoboni would have to engage the financial and tax advisory services of QA and QA would certify the "economic substance" of the tax strategy. Allegedly, independent review of the strategy by other professionals was prohibited by KPMG, as the strategy was "confidential."

The strategy involved Jacoboni purchasing shares of a Swiss bank for approximately $1.74 million and a warrant from a Cayman Islands company for $2.45 million. The shares were then sold, purchased and resold in a series of transactions "designed to effect a 'basis shift'" which would enable Jacoboni to claim a capital loss on his sale of the Swiss bank stock. (*See* Doc. No. 84 at 5–6). The transactions were at the direction of and executed by KPMG and QA, according to Jacoboni. Jacoboni asserts that he was not apprised of the significant tax risks associated with this strategy, and KPMG represented that it was "bullet proof." *Id.* at 6. KPMG and QA were paid "substantial fees" for their services. *Id.* at 9.

KPMG sent Jacoboni an engagement letter dated September 15, 1997, which Jacoboni eventually signed. KPMG also sent a Representation Letter, which allegedly contained representations Jacoboni did not know to be true. KPMG insisted that Jacoboni sign the letter and return it, as a prerequisite to Jacoboni's receiving KPMG's promised tax opinion and completing his 1997 tax return. Jacoboni and his attorney had discussions with KPMG, wherein certain representations were allegedly made by KPMG, including that the Representation Letter was not prepared to insulate KPMG from liability if there was a problem or penalty as a result of a future IRS audit and that KPMG would still be "...on the hook." *Id.* at 12. According to Jacoboni, he relied on these assurances and eventually signed the Representation Letter.

KPMG did not deliver its promised tax opinion regarding the 1997 investments to Jacoboni, but Jacoboni did receive a "concurring opinion" from a law firm. KPMG prepared Jacoboni's 1997 federal income

---

4. The following background statement is taken nearly verbatim from the "Background" section of the R & R; neither side has objected to the Magistrate Judge's recitation of the facts. "Plaintiff" as used in the R & R has been changed herein to "Jacoboni." Footnotes appearing in the "Background" section of the R & R are included herein, although the footnote numbers have been changed to conform sequentially to the footnotes in this Order.

5. Jacoboni's initial pleadings, which included claims against Quadra Capital Management, L.P., d/b/a QA Investments (herein "QA"), were dismissed by the Court, and Jacoboni was given leave to amend and proceed solely against Defendant KPMG (Doc. Nos. 57 and 83). These allegations are effectively supplemented by Jacoboni's RICO statement (Doc. No. 29), filed in response to a directive from the Court.

tax return, which reflected over $30 million in capital losses from the tax strategy.

In July 2001, the Internal Revenue Service issued a notice regarding "Basis Shifting Tax Shelters," indicating that certain transactions involving foreign corporations could be subject to disallowance for tax purposes, interest on unpaid taxes, and possible penalties against taxpayers and others. Allegedly, KPMG knew that the IRS was investigating and challenging similar offshore investments "at least 2½ years earlier" but did not inform Jacoboni. *Id.* at 14. The IRS subsequently initiated an audit of Jacoboni's 1997 tax return and at the time of the filing of the Second Amended Complaint, the audit was not resolved.[6]

Jacoboni sues KPMG under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) (Count I), and asserts numerous state law claims: breach of contract (Count II); accountant malpractice (Count III); fraud (Count IV); negligent misrepresentation (Count V); promissory estoppel (Count VI); and violation of Florida's Deceptive and Unfair Trade Practices Act (Count VII). KPMG denies any wrongdoing and has counterclaimed in various counts for unpaid fees, fraud and contractual indemnification (Doc. Nos. 93 and 103).

## III. ANALYSIS

### A. RICO Claim

As amended by the PSLRA, the RICO statute provides:

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and

the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.* The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final. (emphasis added)

18 U.S.C.A. § 1964(c).

As previously noted, the Magistrate Judge determined that the emphasized language barred some, but not all, aspects of Jacoboni's RICO claim. The Magistrate recognized that "courts that have addressed this issue have concluded that this section has broad application to preclude plaintiffs from asserting RICO claims based on predicate acts that could have given rise to claims of securities fraud." R & R at 5 (citing *Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.*, 165 F.Supp.2d 1345, 1356 (S.D.Fla.2001), *aff'd*, *Green Leaf Nursery v. DuPont*, 341 F.3d 1292 (11th Cir.2003); *Bald Eagle Area School Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3rd Cir.1999); and *Howard v. America Online Inc.*, 208 F.3d 741, 749–50 (9th Cir.), *cert. denied*, 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000)). He also noted KPMG's reliance on "a Southern District of Florida case asserting similar claims against KPMG, based on the same (or a similar) tax strategy complained of in this case." R & R at 6. He characterized that case, *Loftin v. KPMG LLP*, 2003 WL 22225621 (S.D.Fla.2003), as one in which the district judge "found that the alleged predicate acts of mail and wire

---

**6.** According to latter filings, Jacoboni has since settled with the IRS, resulting in the

disallowance in large part of the capital loss claimed and a substantial tax liability.

fraud relating to KPMG's FLIP strategy 'would be actionable under 15 U.S.C. § 78j(b) and SEC Rule 10b–5,' and therefore the PSLRA bar applied to warrant dismissal of Loftin's RICO claim with prejudice." R & R at 6. Nevertheless, the Magistrate Judge declined to follow those authorities, stating that he did not consider the PSLRA "to be an absolute bar to any RICO action involving securities." *Id.* at 6.

After analyzing the language of § 1964(c) and acknowledging the securities laws have been "construed ... broadly to encompass a wide range of conduct actionable as fraud," R & R at 8, the Magistrate Judge reviewed Jacoboni's pleadings "to determine whether the conduct pled is actionable as securities fraud and, if so, whether adequate non-securities fraud conduct is pled to support a RICO claim," *id.* In that regard, the Magistrate stated:

In his RICO Case Statement (Doc. No. 29, 4–8), Plaintiff lists and describes in detail the predicate acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) he asserts constitute the pattern of racketeering activity. Specifically, Plaintiff states as follows:

1) Mail Fraud—KPMG and QA Investments mailed Jacoboni a three-page engagement letter on September 15, 1997 for his signature. The letter was an attempt to insulate KPMG from any liability. At the advice of his attorney, Jacoboni did not sign the letter in 1997 because it was confusing and misleading....

2) Mail Fraud—In May 1998, KPMG and QA prepared a letter for Mr. Jacoboni's signature regarding "Leveraged Investment in the stock of United (sic) Bank of Switzerland," which incorrectly suggested that Jacoboni had detailed knowledge of all the transactions comprising the KPMG/QA Tax Strategy (["]Repre-

sentation Letter").... Only after an interstate telephone call from Ms. Branan and Mr. Richie of KPMG to Mr. Jacoboni on June 16, 1998, during which they pressured Mr. Jacoboni and his lawyer, Tom Dixon, did Mr. Jacoboni sign and return via U.S. mail the May 15, 1998 letter....

3) Mail Fraud—Mr. Jacoboni received a copy of an August 31, 1998 "concurring opinion" from the law firm Brown & Wood LP, which was requested by Mr. Dale Baumann of KPMG. The Brown & Wood concurring tax opinion was mailed from New York to Mr. Jacoboni in Florida.

4) Mail Fraud—KPMG and QA Investments participated in the preparation of a misleading tax return on behalf of Jacoboni. The Defendants knew that the plan was being investigated and had been challenged by the IRS[.] Nevertheless KPMG sent the return to Jacoboni using the U.S. Mail in October of 1998 knowing that Jacoboni would rely on KPMG's expertise and then mail the tax return to the IRS....

5) Mail Fraud—In late 2001, Mr. Jacoboni terminated the services of KPMG and retained a new accountant, Mr. Dean Orr ... Mr. Jacoboni wrote several interstate letters to KPMG requesting transfer of his records to Mr. Orr. KPMG unreasonably delayed and stonewalled Mr. Jacoboni's requests. "Finally, Mr. James M. McMahon of KPMG wrote a January 29, 2002 letter to Mr. Orr attempting to impose unreasonable conditions on Mr. Orr's access to Mr. Jacoboni's records and KPMG's related work papers."...

6) Wire Fraud—In September 1997, Ms. Carolyn Branan, a partner at KPMG, contacted Jacoboni over the

phone to propose the KPMG/QA Tax Strategy. Throughout their conversations, she misrepresented the strategy by claiming it was a "no lose" proposition, was a "clean deal, never audited,"and strictly complied with IRS rules and regulations". At all times, KPMG knew that the strategy was risky and failed to disclose that knowledge to Jacoboni. . . .

7) Wire Fraud—Carolyn Branan and Craig Richie of KPMG in Charlotte, North Carolina called Mr. Jacoboni in Florida on June 16, 1998. Mr. Jacoboni added his lawyer, Tom Dixon, in Detroit, Michigan, in a conference call. Ms. Branan and Mr. Richie pressured Mr. Jacoboni to sign and return the May 1998 "Representation Letter." In particular, Mr. Richie "assured Messrs. Jacoboni and Dixon that the KPMG Representations [sic] Letter was *not* prepared to insulate KPMG from liability and that KPMG is 'still on the hook' if there was a problem down the road. Mr. Richie state[d] that KPMG would still be responsible if there was a problem or penalty as a result of a future IRS audit. . . .

8) Wire Fraud—The complex series of transactions to implement the KPMG/QA Tax Strategy set forth in Paragraph 9 of the Complaint were carried out through interstate phone calls and wire transfers. . . ." For example, Mr. Jacoboni received from KPMG via facsimile transmission a recap of his investment in UBS prepared by QA on October 7, 1997. There were also numerous interstate facsimile transmissions and wire transfers among Mr. Jacoboni and

KPMG and QA and their agents to effectuate the 1997 investments.". . .
R & R at 9–10.

The Magistrate Judge then reasoned:
Applying the law to the facts alleged, it is clear that certain of the predicate acts allege breaches of fiduciary duty that coincide directly with the securities transactions that were part of the tax strategy. Specifically, the predicate acts set forth above as wire fraud "8" are intimately connected with the purchase and sale of the securities. Moreover, predicate acts identified above as mail fraud "2" and wire fraud "6" set forth breaches of fiduciary duty that can fairly be said to be "in connection with" the sale of securities.[7]

The remaining predicate acts, however, have no readily apparent connection to securities transactions, and can not be said to have "coincided" with the transactions. Indeed, the harm alleged to have occurred due to KPMG's conduct was not caused by the "basis shift" purchases of stock allegedly directed by KPMG, but by the inclusion of the artificial loss in the preparation and filing of Plaintiff's tax return. *See, generally, Bacon v. Smith Barney Shearson, Inc.,* 938 F.Supp. 98 (D.N.H.1996) (claim that firm had fraudulently represented that transfer of account in order to sell certain stocks would not result in adverse tax consequences was not a fraud in connection with the purchase or sale of a security.) As such, the PSLRA bar does not serve to insulate KPMG from Plaintiff's entire RICO claim, but only applies to prohibit Plaintiff from "rely[ing] upon any conduct that would have been actionable as fraud in the purchase or sale of securities to estab-

---

**7.** In a footnote appended to this paragraph, the Magistrate Judge correctly noted: "Securities fraud encompasses more than the value or manipulation of a particular security." R & R at 11 n. 4.

lish a violation of section 1962"—that is, that conduct set forth in Plaintiff's alleged predicate acts of mail fraud 2 and wire fraud 6 and 8.

The Court recognizes that other courts appear to take an all or nothing approach to the bar. *See Burton v. Ken–Crest Services, Inc.,* 127 F.Supp.2d 673, 676 (E.D.Pa.2001) (rejecting argument that some predicate acts are not actionable as securities fraud and are thus separate and independent predicate acts for RICO purposes); *Bald Eagle, supra,* 189 F.3d at 330 (rejecting a "surgical presentation" of the claim); and *Stephenson v. Deutsche Bank AG,* 282 F.Supp.2d 1032, 1072 n. 27 (D.Minn. 2003) (same). In each of these cases, however, there was a determination that the other predicate acts were so "closely connected to and dependent upon" the securities fraud as to "amount to" securities fraud. *See Burton, supra,* at 677 (noting "there is no question that the whole of Plaintiff's allegations concern a fraudulent transaction of securities" and stating "it is obvious that the entire cause of action surrounding the pension fund scheme involves some type of securities fraud and that the alleged acts are actionable under securities fraud statutes"); *Bald Eagle, supra* at 330 (finding that conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities since the conduct induces new investments); and *Stephenson, supra* at 1072, fn. 27 (finding that the challenged activity was "not distinct from the larger scheme, which the Court has already ruled is actionable as securities fraud.")

No such connection is present here with respect to the surviving predicate acts.

Preparation and filing of tax returns (and the collection of fees for tax planning services and opinions) are acts distinct from any securities transaction and are not actionable as securities fraud, and there is no allegation that KPMG used Jacoboni's participation in the strategy to induce others to purchase securities.

The Court also recognizes that this conclusion is substantially at odds with the analysis in *Loftin, supra,* which is presently on appeal. *Loftin* is not controlling, however, and is not persuasive on this issue.[8] Specifically, the Court notes that the *Loftin* court did not address the precise issue presented here with respect to the application of the PSLRA bar when non-related predicate acts are also alleged. In addition, the allegations in *Loftin* that the purpose of the alleged fraud was to induce the plaintiff "to invest in the transactions" runs contrary to the overall thrust of Plaintiff's allegations in this case to the effect that the purpose of the fraudulent scheme was simply to collect fees and expenses and to promote an improper tax avoidance strategy.

For the foregoing reasons, it is **respectfully recommended** that the motion be **granted, in part and denied, in part** as follows: The motion should be denied to the extent it seeks judgment on the pleadings, but **granted** to the extent it seeks to prohibit Plaintiff from relying upon any conduct set forth in Plaintiff's alleged predicate acts of mail fraud 2 and wire fraud 6 and 8 to establish a violation of section 1962. The practical effect of the Court's recommendation is to limit Plaintiff's RICO case to the remaining predicate acts. Because the

**8.** In a footnote following this sentence, the Magistrate Judge observed that *Loftin* "reli[ed] on cases that are distinguishable from the factual scenario presented here." R & R at 13 n. 6.

Court does not recommend judgment on the pleadings with respect to the RICO claim, dismissal of the pendent state law counts is also inappropriate and the motion should be **denied** with respect to those counts.

R & R at 11–14 (footnote omitted from second quoted paragraph; emphasis in original).

As the Magistrate Judge aptly noted, "defining and categorizing conduct as securities or non-securities fraud is not easy, especially with respect to a complex and multifaceted transaction." R & R at 7. Truer words have never been spoken. However, with all due respect to the Magistrate Judge's in-depth analysis of this admittedly difficult issue, the Court believes the R & R interprets the PSLRA too narrowly in the context of this case.

*S.E.C. v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), teaches that while the "in connection with" requirement for securities fraud is not unlimited in scope, it is extremely broad. All that is necessary to satisfy that requirement is proof of "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide." 535 U.S. at 825, 122 S.Ct. 1899. The breadth of this standard is illustrated by footnote 4 to the *Zandford* opinion. There, the Supreme Court provided two examples of conduct that "would not include the requisite connection to a purchase or sale of securities": where "a broker embezzles cash from client's account" or where a broker "takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction." *Id.* at 825 n. 4, 122 S.Ct. 1899. Since these examples involve conduct that is only tangentially connected to the sale of securities, the obvious implication is that conduct less tangentially related satisfies the "in connection with" test.

■ The Court fully agrees with the Magistrate Judge that RICO predicate acts 2, 6 and 8 are actionable as securities fraud. However, the Court also views the other predicate acts as sufficiently connected to the sale of securities to support a claim of securities fraud. In other words, the remaining predicate acts allege breaches of duty coincident with the securities transactions that were part of the tax strategy offered by KPMG. Because Jacoboni contends the wrongful acts were committed as part of a single fraudulent scheme, all of the acts must be considered together for securities fraud purposes. In that regard, the Court agrees with KPMG's characterization of Jacoboni's RICO claim: "There are no 'non-securities components' to the alleged scheme to defraud asserted in Jacoboni's RICO claim. Jacoboni asserts that he was the victim of a single scheme designed to fraudulently induce him to invest in UBS stock and other securities." Doc. 184 at 16. In other words, "without the purchase and sale of UBS stock and options and the Jacaranda warrant, there would have been no capital loss to offset Jacoboni's capital gain on his SSI stock." *Id.* at 18.

This Court finds instructive Judge Ryskamp's analysis in *Loftin v. KPMG LLP,* 2003 WL 22225621 (S.D.Fla.2003). *Loftin,* like the present case, involved the FLIP tax strategy.[9] Loftin argued that the PSLRA did not bar his RICO claim against the law firm of Brown & Wood, which had issued favorable opinion letters concerning the strategy, "because the sale of securities was incidental to Brown & Wood's alleged fraud." 2003 WL 22225621 *6. More specifically, Loftin claimed "that Brown & Wood's primary objective was not the sale of securities, but the sale of 'phony tax advice,'" with the result that the firm's alleged misconduct was not "in

---

**9.** *Loftin* also involved a strategy known as    "BLIP."

connection with" the sale of securities. *Id.* Judge Ryskamp rejected that argument, stating:

> Loftin's Complaint alleges that the Defendants' "pattern of racketeering activity, including the mail and wire fraud, were all committed in an effort to induce [him] to invest in the transactions and, in turn, pay millions of dollars in fees and related expenses to the Enterprise." (ACC ¶ 69.) The transactions consisted of the purchase and sale of securities. (ACC ¶¶ 38, 49.) Thus, Brown & Wood's alleged actions were "in connection with" the purchase and transfer of securities, thereby implicating the PSLRA bar. *See Zandford,* 535 U.S. at 819, 122 S.Ct. at 1903 (explaining that the Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes" and holding that a broker's alleged selling of securities with intent to misappropriate the proceeds was "in connection with" the sale of the securities) (internal quotation omitted).

*Id.* at *6.

In this Court's view, this reasoning applies equally to the instant case. Similar to the allegation in *Loftin,* Jacoboni's RICO Case Statement asserts that "KPMG and QA Investments committed all of the predicate acts as part of one common plan to induce potential clients into investing with them." Doc. 29 at 10. Moreover, Jacoboni's "tax advice fraud" characterization urged here, Doc. 233 at 4, is akin to "phony tax advice" argument rejected in *Loftin.* Based on *Loftin*'s reasoning, the PSLRA precludes Jacoboni's entire RICO claim.

## B. Supplemental Jurisdiction

The Court next examines whether it should continue to exercise supplemental jurisdiction over Jacoboni's state law claims. To reiterate, those claims are breach of contract, accountant malpractice, fraud, negligent misrepresentation, promissory estoppel, and violation of Florida's Deceptive and Unfair Trade Practices Act (DUTPA).

Title 28, United States Code, Section 1367 codifies the doctrines formerly known as pendent and ancillary jurisdiction. *See Palmer v. Hosp. Auth. of Randolph County,* 22 F.3d 1559, 1562 n. 3 (11th Cir.1994). "[W]henever a federal court has supplemental jurisdiction under section 1367(a), that jurisdiction should be exercised unless section 1367(b) or (c) applies." *Palmer,* 22 F.3d at 1569. Under § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state claim where, as here, it "has dismissed all claims over which it has original jurisdiction[.]" If, after examining the provisions of § 1367(c), the district court determines that it has the discretion to decline jurisdiction, it should consider traditional factors bearing on the exercise of pendent jurisdiction. *Palmer,* 22 F.3d at 1569. Those factors include "judicial economy, convenience, fairness to the parties, and whether all the claims would be expected to be tried together." *Id.*

Obviously, the Court has the discretion to decline to exercise supplemental jurisdiction over Jacoboni's state claims, inasmuch as it has "dismissed all claims over which it has original jurisdiction." § 1367(c)(3). Accordingly, the Court will examine the factors listed in *Palmer* to determine the proper exercise of that discretion.

█ In the Court's view, considerations of judicial economy, convenience and fairness are intertwined in this case. It is true that this matter has been pending in this court for nearly two years and the undersigned judge is already familiar with the case. However, only state claims remain, and considerations of practicality and comity counsel that a state judge is

best equipped to adjudicate those claims. "Resolution of [Jacoboni's] state law claims depends on determinations of state law," and "[s]tate courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Nat. Bank of Gainesville,* 117 F.3d 1342, 1353 (11th Cir.1997).[10] This is particularly true here, given the fact that this is a complex case and involves, *inter alia,* a claim brought under Florida's DUTPA.[11] Moreover, the fact that this case was scheduled to be tried soon does not preclude this Court from electing not to proceed on the state claims. Although this case has proceeded through the completion of discovery, Jacoboni (and KPMG) can use the evidence gleaned through that process to litigate their dispute in state court. *See Annulli v. Panikkar,* 200 F.3d 189, 202–03 (3d Cir.1999) (rejecting plaintiff's argument that "two years of litigation, fifteen pages of court docket, 1,800 pages of deposition testimony, and 2,800 pages of discovery documents militate in favor of retaining jurisdiction over his case, especially as he was on the eve of trial when the Defendants filed their motion for summary judgment"), *abrogated on other grounds by Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). Moreover, "little additional pretrial preparation will be required in state court." *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994) (holding that the "district court did not abuse its discretion in declining to exercise jurisdiction over the state-law claims shortly before trial"). In this Court's view, this case is in sufficient shape that it could be set for trial in state court immediately after the pleadings close; this would not present a lengthy delay. Additionally, Jacoboni faces no time-bar threat resulting from dismissal of his state claims; by virtue of the "savings" provision embodied in § 1367(d), he is free to refile those claims in state court within 30 days (unless Florida law provides for a longer period).

The remaining factor—whether all the claims would be expected to be tried together—appears more pertinent to the situation where original jurisdiction continues to exist and a court is attempting to determine whether it should nevertheless decline jurisdiction over supplemental state claims, i.e., the scenarios envisioned by § 1367(c)(1), (2) and (4). Clearly, that is not the situation here. However, to the extent this factor applies to the present case, the Court determines that all of the state claims should be tried together—in state court.

Further, where, as here, the federal claims are dismissed prior to trial, dismissal of supplemental state claims is "strongly encourage[d] or even require[d]." *Mergens v. Dreyfoos,* 166 F.3d 1114, 1119 (11th Cir.) (holding that since all federal claims were dismissed before trial, district court appropriately declined to exercise supplemental jurisdiction over remaining state claim), *cert. denied,* 528 U.S. 820, 120 S.Ct. 63, 145 L.Ed.2d 55 (1999); *see also, Baggett v. First Nat. Bank of Gainesville,* 117 F.3d 1342, 1353 (11th Cir.1997) (stating that it was "especially true" that Georgia court should resolve remaining state claims "where the Court is dismissing Plaintiffs' federal law claim prior to tri-

---

**10.** The quoted statement appears in the district court's opinion attached as Exhibit "A" to the Eleventh Circuit's *Baggett* decision. The appellate court expressly adopted the lower court's opinion. *See* 117 F.3d at 1344.

**11.** The Court is unpersuaded that it should allow the state claims to remain here on the asserted basis that they involve some issues of federal tax law. This Court is no tax court. Any such issues can be handled equally well by a judge of the state court bench. In any event, any marginally greater familiarity this Court might have with tax issues is overbalanced by a state judge's familiarity with predominant issues of state law.

al"); [12] *Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir.1996) (articulating as a "rule of thumb" that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed"), *amended on denial of reh'g*, 1998 WL 117980 (6th Cir.1998); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir.) (noting "general rule" that district court should relinquish jurisdiction over state law claims when all federal claims are dismissed before trial), *cert. denied*, 525 U.S. 870, 119 S.Ct. 167, 142 L.Ed.2d 136 (1998).

As previously discussed, given the PSLRA's prohibition against founding RICO claims on securities violations, Jacoboni should never have advanced such a claim under the facts of this case. He took a calculated risk by combining his state claims with a RICO claim. His counsel "must have realized that the jurisdiction he invoked was pendent and possibly tentative." *Pitchell*, 13 F.3d at 549. In other words, Jacoboni and his attorneys "knowingly risked dismissal of his pendent claims when they filed suit in federal district court and invoked the Court's discretionary supplemental jurisdiction power." *Annulli*, 200 F.3d at 203 (citing *Pitchell*).

## IV. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. The Magistrate Judge's February 5, 2004 Report and Recommendation (Doc. 181) is APPROVED AND ADOPTED insofar as it determines that RICO predicate acts 2, 6 and 8 are barred by the PSLRA. The Court declines to adopt the R & R insofar as it recommends denial of KPMG's Motion for Judgment on the

Pleadings (Doc. 143). The R & R is moot with respect to the Magistrate Judge's recommendations concerning KPMG's Motion for Summary Judgment (Doc. 155) and KPMG's Motion to Exclude the Expert Opinion of Bruce G. Dubinsky (Doc. 159).

2. KPMG's Objections (Doc. 184) to the R & R, filed February 23, 2004, are sustained insofar as KPMG objects to the Magistrate Judge's recommendation that KPMG's Motion for Judgment on the Pleadings be denied. In all other respects, KPMG's objections are moot.

3. KPMG's Motion for Judgment on the Pleadings (Doc. 143), filed November 5, 2003, is GRANTED.

4. The Clerk shall enter a final judgment providing that the Plaintiff, Joseph J. Jacoboni, shall take nothing on his federal civil racketeering claims against the Defendant, KPMG LLP, and further providing that the Defendant shall recover its costs of action.

5. KPMG's Motion for Summary Judgment (Doc. 155) and Motion to Exclude the Expert Opinion of Bruce G. Dubinsky (Doc. 159), both filed November 24, 2003, are moot.

6. Any other pending motions not addressed in this Order are likewise moot.

7. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Accordingly, those claims are DISMISSED, WITHOUT PREJUDICE. Plaintiff is free to refile those claims in state court within the time constraints set forth in 28 U.S.C. § 1367(d).

8. The Clerk shall close this case.

---

**12.** Again, this quoted statement appears in the district court's opinion attached as Exhibit "A" to the Eleventh Circuit's *Baggett* decision.

BAKER, United States Magistrate Judge.

## REPORT AND RECOMMENDATION

## TO THE UNITED STATES DISTRICT COURT

This cause came on for consideration without oral argument on the following motions filed herein:

MOTION: DEFENDANT KPMG'S MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. No. 143)

FILED: November 5, 2003

THEREON it is RECOMMENDED that the motion be GRANTED, in part and DENIED, in part.

MOTION: DEFENDANT KPMG'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 155)

FILED: November 24, 2003

THEREON it is RECOMMENDED that the motion be DENIED.

MOTION: DEFENDANT KPMG'S MOTION TO EXCLUDE THE EXPERT OPINION OF BRUCE G. DUBINSKY (Doc. No. 159)

FILED: November 24, 2003

THEREON it is RECOMMENDED that the motion be GRANTED, in part and DENIED, in part.

### BACKGROUND

As set forth in the operative Second Amended Complaint (Doc. No. 84),[1] as a result of a sale of stock, Plaintiff faced approximately $28 million in federal income tax capital gains liability in 1997. After being referred to Defendant KPMG by his banker, Plaintiff decided to enter into an investment strategy (referred to as "FLIP") proposed by KPMG. According to

the allegations, KPMG represented the strategy as a "no lose" proposition in that he would either make money or any losses incurred would offset the 1997 capital gains for federal income tax purposes. KPMG represented that Plaintiff would have to engage the financial and tax advisory services of QA and QA would certify the "economic substance" of the tax strategy. Allegedly, independent review of the strategy by other professionals was prohibited by KPMG, as the strategy was "confidential."

The strategy involved Plaintiff purchasing shares of a Swiss bank for approximately $1.74 million and a warrant from a Cayman Islands company for $2.45 million. The shares were then sold, purchased and resold in a series of transactions "designed to effect a 'basis shift'" which would enable Plaintiff to claim a capital loss on his sale of the Swiss bank stock. (*See* Doc. No. 84 at 5–6). The transactions were at the direction of and executed by KPMG and QA, according to Plaintiff. Plaintiff asserts that he was not apprised of the significant tax risks associated with this strategy, and KPMG represented that it was "bullet proof." *Id.* at 6. KPMG and QA were paid "substantial fees" for their services. *Id.* at 9.

KPMG sent Plaintiff an engagement letter dated September 15, 1997, which Plaintiff eventually signed. KPMG also sent a Representation Letter, which allegedly contained representations Plaintiff did not know to be true. KPMG insisted that Plaintiff sign the letter and return it, as a prerequisite to Plaintiff's receiving KPMG's promised tax opinion and completing his 1997 tax return. Plaintiff and

1. Plaintiff's initial pleadings, which included claims against Quadra Capital Management, L.P., d/b/a QA Investments (herein "QA"), were dismissed by the Court, and Plaintiff was given leave to amend and proceed solely against Defendant KPMG (Doc. Nos. 57 and 83). These allegations are effectively supplemented by Plaintiff's RICO statement (Doc. No. 29), filed in response to a directive from the Court.

his attorney had discussions with KPMG, wherein certain representations were allegedly made by KPMG, including that the Representation Letter was not prepared to insulate KPMG from liability if there was a problem or penalty as a result of a future IRS audit and that KPMG would still be "... on the hook." *Id.* at 12. According to Plaintiff, he relied on these assurances and eventually signed the Representation Letter.

KPMG did not deliver its promised tax opinion regarding the 1997 investments to Plaintiff, but Plaintiff did receive a "concurring opinion" from a law firm. KPMG prepared Plaintiff's 1997 federal income tax return, which reflected over $30 million in capital losses from the tax strategy.

In July 2001, the Internal Revenue Service issued a notice regarding "Basis Shifting Tax Shelters," indicating that certain transactions involving foreign corporations could be subject to disallowance for tax purposes, interest on unpaid taxes, and possible penalties against taxpayers and others. Allegedly, KPMG knew that the IRS was investigating and challenging similar offshore investments "at least 2½ years earlier" but did not inform Plaintiff. *Id.* at 14. The IRS subsequently initiated an audit of Plaintiff's 1997 tax return and at the time of the filing of the Second Amended Complaint, the audit was not resolved.[2]

Plaintiff sues KPMG under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) (Count I), and asserts numerous state law claims: breach of contract (Count II); accountant malpractice (Count III); fraud (Count IV); negligent misrepresentation (Count V); promissory estoppel (Count VI); and violation of Florida's Deceptive and Unfair Trade Practices Act (Count VII). KPMG denies any wrongdoing and has counterclaimed in various counts for unpaid fees, fraud and contractual indemnification (Doc. Nos. 93 and 103).

Extensive discovery has been conducted and the matters have been fully briefed. The Court treats each motion, in turn.

### MOTION FOR JUDGMENT ON THE PLEADINGS

The Court has reviewed the motion (Doc. No. 143), the supporting memorandum (Doc. No. 144), Plaintiff's memorandum (Doc. No. 158), and the rest of the record, including the filings related to other similar cases against KPMG (*see, e.g.,* Doc. Nos. 154, 177, 178).

Under Fed.R.Civ.P. 12(c), a party may move for a judgment on the pleadings after the pleadings are closed. "Judgment on the pleadings under Rule 12(c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Horsley v. Rivera,* 292 F.3d 695, 700 (11th Cir.2002) *citing Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d 1367, 1370 (11th Cir.1998). "If upon reviewing the pleadings it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations, the court should dismiss the complaint." *Id., citing White v. Lemacks,* 183 F.3d 1253, 1255 (11th Cir.1999).

As set forth above, the operative complaint sets forth a RICO claim, coupled with several state law claims. The motion is addressed primarily to the RICO claim (as the state law claims are before the Court solely under the Court's supplemental jurisdiction) and is based on a section of the Private Securities Litigation Reform

---

**2.** According to latter filings, Plaintiff has since settled with the IRS, resulting in the disallow-ance in large part of the capital loss claimed and a substantial tax liability.

Act of 1995, 18 U.S.C.A. § 1964(c), which provides:

>    (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.* The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final. [emphasis added]

Defendant argues that Plaintiff's RICO claim is precluded by this section in that, while KPMG is not contending that the tax strategy constituted a securities transaction in itself, it "contends that the Complaint alleges misrepresentations in connection with the sale of UBS shares which triggers the bar." (Doc. No. 144 at 7, fn. 6). The Court agrees that certain aspects of Plaintiff's claim are not actionable under RICO, but finds that this section of PSLRA does not bar Plaintiff's RICO claim in its entirety, and thus, judgment on the pleadings should not be granted.

Defendant correctly notes that courts that have addressed this issue have concluded that this section has broad application to preclude plaintiffs from asserting RICO claims based on predicate acts that could have given rise to claims of securities fraud. *See Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.,* 165 F.Supp.2d 1345, 1356 (S.D.Fla.2001), *aff'd, Green Leaf Nursery v. DuPont,* 341 F.3d 1292 (11th Cir.2003); *Bald Eagle Area School District v. Keystone Fin., Inc.,* 189 F.3d 321, 330 (3rd Cir.1999); *Howard v. America Online Inc.,* 208 F.3d 741, 749–50 (9th Cir.2000). Defendant also relies on a Southern District of Florida case asserting similar claims against KPMG, based on the same (or a similar) tax strategy complained of in this case. *See Loftin v. KPMG LLP,* 2003 WL 22225621 (S.D.Fla. 2003). In *Loftin,* which is presently on appeal, Judge Ryskamp found that the alleged predicate acts of mail and wire fraud relating to KPMG's FLIP strategy "would be actionable under 15 U.S.C. § 78j(b) and SEC Rule 10b–5," and therefore the PSLRA bar applied to warrant dismissal of Loftin's RICO claim with prejudice.

In response, Plaintiff argues that the above cases are distinguishable on their facts, and that *this* case is not securities fraud but tax advice fraud. The Court finds that Plaintiff has alleged and relies on various acts that include matters actionable both as securities fraud and as non-securities fraud. The Court differs with the above authorities, however, in that it does not find PSLRA to be an absolute bar to any RICO action involving securities.

We begin with the language of the statute: "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." Many remedial statutes include a clause preserving all other remedies for suitors. This language runs in a contrary direction, but not completely so. The statute does not bar a RICO claim whenever someone could assert a securities fraud claim arising from a given relationship. Rather, the bar only relates to reliance, as a basis for the RICO claim, on specific conduct "actionable" as securities fraud. Some of the cases cited above do not discuss this distinction and dismissed the RICO claims

without any express consideration of whether a RICO claim was present after excluding conduct actionable as securities fraud. Others found the entire fraud scheme to be actionable as securities fraud, thus barring any RICO claim.

Carving a cause of action into securities and non-securities components presents theoretical and practical concerns. Typically, the law looks at a cause of action as a unit, encompassing all rights and remedies that may flow from a given set of circumstances. A given relationship, transaction or course of conduct may give rise to multiple claims for redress, that may sound in tort, contract, or under one or more statutes. Usually, a plaintiff is required to bring all claims arising from related conduct in a single action or suffer a likely bar to splitting causes of action, under principles of res judicata. As noted above, most remedial schemes permit a plaintiff to choose multiple grounds for relief and to rely on the same conduct to support various grounds. The statutory scheme enacted here, involving two remedial avenues takes a different approach, by segregating securities fraud from RICO claims. This theoretical objection to separation of the remedies is, of course, subject to congressional control, since it is the statutes that create the rights themselves. Thus, any res judicata related objection fails in light of the statutory language.

The practical difficulty is that defining and categorizing conduct as securities or non-securities fraud is not easy, especially with respect to a complex and multifaceted transaction. This difficulty is exacerbated by the broad (and sometimes vague) sweep of conduct that might be actionable as fraud under the securities laws. Drawing this line presents pleading problems for a plaintiff and may require some unusual pretrial rulings by the court, possibly also requiring special jury instructions as to how to consider various pieces of evidence.

These difficulties are sufficiently daunting to make tempting the alternative of simply barring *any* RICO claim when a "security" is involved. The statutory language here, however, is quite clearly to the contrary. Had Congress intended the broader bar, it could easily have so provided. Thus, it is necessary to decide whether Plaintiff's allegations in this case, after disregarding conduct actionable as securities fraud, states a RICO claim.

The courts have construed the securities laws broadly to encompass a wide range of conduct actionable as fraud. *See, e.g., Securities and Exchange Comm. v. Edwards,* — U.S. ——, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004). Still, not all conduct associated with a transaction that happens to involve a security is actionable as securities fraud. For purposes of applying the PSLRA bar, as noted by the Third Circuit, "the proper focus of the analysis is on whether the conduct pled as predicate offenses is 'actionable' as securities fraud-not on whether the conduct is 'intrinsically connected to, and dependent upon' conduct actionable as securities fraud." *Bald Eagle Area School Dist. v. Keystone Financial, Inc.,* 189 F.3d 321, 330 (3d Cir.1999) (affirming dismissal where predicate conduct was an integral part of the securities based Ponzi scheme). This is consistent with the legislative purpose of the PSLRA bar-to protect defendants from overlapping exposure for the same underlying conduct. *See Florida Evergreen Foliage, supra,* at 1357, citing *Rowe v. Marietta Corp.,* 955 F.Supp. 836, 847 (W.D.Tenn.1997) (citing Testimony of Hon. Arthur Levitt, Chairman of the SEC, Hearings on H.R. 10, the Common Sense Legal Reform Act of 1995, before the Telecommunications and Finance Subcommittee of the House Commerce Committee, February 10, 1995, reprinted in 1995 U.S.C.C.A.N. 679, 746).

Applied here, the Court reviews Plaintiff's pleadings to determine whether the conduct pled is actionable as securities fraud and, if so, whether adequate non-securities fraud conduct is pled to support a RICO claim. Both sides (and this Court) agree that the FLIP tax strategy undertaken by Plaintiff does not constitute a securities transaction in and of itself. (Doc. No. 144, fn. 6 and Doc. No. 158 at 9). That said, the question presented is whether a tax strategy which includes the purchase and sale of securities, but is not *itself* a securities transaction is actionable as securities fraud. In order to evaluate this issue, the Court looks in detail to the conduct pled as predicate offenses. *Bald Eagle, supra.*

In his RICO Case Statement (Doc. No. 29, 4–8), Plaintiff lists and describes in detail the predicate acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) he asserts constitute the pattern of racketeering activity. Specifically, Plaintiff states as follows:

1) Mail Fraud—KPMG and QA Investments mailed Jacoboni a three-page engagement letter on September 15, 1997 for his signature. The letter was an attempt to insulate KPMG from any liability. At the advice of his attorney, Jacoboni did not sign the letter in 1997 because it was confusing and misleading. . . .

2) Mail Fraud—In May 1998, KPMG and QA prepared a letter for Mr. Jacoboni's signature regarding "Leveraged Investment in the stock of United (sic) Bank of Switzerland," which incorrectly suggested that Jacoboni had detailed knowledge of all the transactions comprising the KPMG/QA Tax Strategy (Representation Letter"). . . . Only after an interstate telephone call from Ms. Branan and Mr. Richie of KPMG to Mr. Jacoboni on June 16, 1998, during

which they pressured Mr. Jacoboni and his lawyer, Tom Dixon, did Mr. Jacoboni sign and return via U.S. mail the May 15, 1998 letter. . . .

3) Mail Fraud—Mr. Jacoboni received a copy of an August 31, 1998 "concurring opinion" from the law firm Brown & Wood LP, which was requested by Mr. Dale Baumann of KPMG. The Brown & Wood concurring tax opinion was mailed from New York to Mr. Jacoboni in Florida.

4) Mail Fraud—KPMG and QA Investments participated in the preparation of a misleading tax return on behalf of Jacoboni. The Defendants knew that the plan was being investigated and had been challenged by the IRS, Nevertheless KPMG sent the return to Jacoboni using the U.S. Mail in October of 1998 knowing that Jacoboni would rely on KPMG's expertise and then mail the tax return to the IRS. . . .

5) Mail Fraud—In late 2001, Mr. Jacoboni terminated the services of KPMG and retained a new accountant, Mr. Dean Orr . . . Mr. Jacoboni wrote several interstate letters to KPMG requesting transfer of his records to Mr. Orr. KPMG unreasonably delayed and stonewalled Mr. Jacoboni's requests. "Finally, Mr. James M. McMahon of KPMG wrote a January 29, 2002 letter to Mr. Orr attempting to impose unreasonable conditions on Mr. Orr's access to Mr. Jacoboni's records and KPMG's related work papers." . . .

6) Wire Fraud—In September 1997, Ms. Carolyn Branan, a partner at KPMG, contacted Jacoboni over the phone to propose the KPMG/QA Tax Strategy. Throughout their conversations, she misrepresented the strategy by claiming it was a "no lose"

proposition, was a "clean deal, never audited," and strictly complied with IRS rules and regulations". At all times, KPMG knew that the strategy was risky and failed to disclose that knowledge to Jacoboni....

7) Wire Fraud—Carolyn Branan and Craig Richie of KPMG in Charlotte, North Carolina called Mr. Jacoboni in Florida on June 16, 1998. Mr. Jacoboni added his lawyer, Tom Dixon, in Detroit, Michigan, in a conference call. Ms. Branan and Mr. Richie pressured Mr. Jacoboni to sign and return the May 1998 "Representation Letter." In particular, Mr. Richie "assured Messrs. Jacoboni and Dixon that the KPMG Representations [sic] Letter was *not* prepared to insulate KPMG from liability and that KPMG is 'still on the hook' if there was a problem down the road. Mr. Richie state that KPMG would still be responsible if there was a problem or penalty as a result of a future IRS audit....

8) Wire Fraud—The complex series of transactions to implement the KPMG/QA Tax Strategy set forth in Paragraph 9 of the Complaint were carried out through interstate phone calls and wire transfers...." For example, Mr. Jacoboni received from KPMG via facsimile transmission a recap of his investment in UBS prepared by QA on October 7, 1997. There were also numerous interstate facsimile transmissions and wire transfers among Mr. Jacoboni and KPMG and QA and their agents to effectuate the 1997 investments."...

As explained by the United States Supreme Court in *S.E.C. v. Zandford,* 535 U.S. 813, 819, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002):

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j. Rule 10b–5, which implements this provision, forbids the use, "in connection with the purchase or sale of any security," of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates ... as a fraud or deceit." 17 CFR § 240.10b–5 (2000).

While "the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security,'" the Supreme Court notes that "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *Id.* As defined by the Supreme Court, "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide ... [are] 'in connection with' securities sales within the meaning of § 10(b)." *Id.,* 535 U.S. 813, at 825, 122 S.Ct. 1899, 153 L.Ed.2d 1.[3]

Applying the law to the facts alleged, it is clear that certain of the predicate acts

---

**3.** The Supreme Court was careful to note that its analysis did not transform every breach of fiduciary duty into a federal securities violation. "If, for example, a broker embezzles cash from a client's account or takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction, then the fraud would not include the requisite connection to a purchase or sale of securities. Tr. of Oral Arg. 16. Likewise, if the broker told his client he was stealing the client's assets, that breach of fiduciary duty might be in connection with a sale of securities, but it would not involve a deceptive device or fraud." 535 U.S. at 825, n. 4, 122 S.Ct. 1899.

allege breaches of fiduciary duty that coincide directly with the securities transactions that were part of the tax strategy. Specifically, the predicate acts set forth above as wire fraud "8" are intimately connected with the purchase and sale of the securities. Moreover, predicate acts identified above as mail fraud "2" and wire fraud "6" set forth breaches of fiduciary duty that can fairly be said to be "in connection with" the sale of securities.[4]

The remaining predicate acts, however, have no readily apparent connection to securities transactions, and can not be said to have "coincided" with the transactions. Indeed, the harm alleged to have occurred due to KPMG's conduct was not caused by the "basis shift" purchases of stock allegedly directed by KPMG, but by the inclusion of the artificial loss in the preparation and filing of Plaintiff's tax return. *See, generally, Bacon v. Smith Barney Shearson, Inc.,* 938 F.Supp. 98 (D.N.H.1996) (claim that firm had fraudulently represented that transfer of account in order to sell certain stocks would not result in adverse tax consequences was not a fraud in connection with the purchase or sale of a security.) As such, the PSLRA bar does not serve to insulate KPMG from Plaintiff's entire RICO claim, but only applies to prohibit Plaintiff from "rely[ing] upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962"—that is, that conduct set forth in Plaintiff's alleged predicate acts of mail fraud 2 and wire fraud 6 and 8.[5]

The Court recognizes that other courts appear to take an all or nothing approach to the bar. *See Burton v. Ken–Crest Services, Inc.,* 127 F.Supp.2d 673, 676 (E.D.Pa.2001) (rejecting argument that some predicate acts are not actionable as

securities fraud and are thus separate and independent predicate acts for RICO purposes); *Bald Eagle, supra,* 189 F.3d at 330 (rejecting a "surgical presentation" of the claim); and *Stephenson v. Deutsche Bank AG,* 282 F.Supp.2d 1032, 1072 n. 27 (D.Minn.2003) (same). In each of these cases, however, there was a determination that the other predicate acts were so "closely connected to and dependent upon" the securities fraud as to "amount to" securities fraud. *See Burton, supra,* at 677 (noting "there is no question that the whole of Plaintiff's allegations concern a fraudulent transaction of securities" and stating "it is obvious that the entire cause of action surrounding the pension fund scheme involves some type of securities fraud and that the alleged acts are actionable under securities fraud statutes"); *Bald Eagle, supra* at 330 (finding that conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities since the conduct induces new investments); and *Stephenson, supra* at 1072, n. 27 (finding that the challenged activity was "not distinct from the larger scheme, which the Court has already ruled is actionable as securities fraud.")

No such connection is present here with respect to the surviving predicate acts. Preparation and filing of tax returns (and the collection of fees for tax planning services and opinions) are acts distinct from any securities transaction and are not actionable as securities fraud, and there is no allegation that KPMG used Jacoboni's participation in the strategy to induce others to purchase securities.

The Court also recognizes that this conclusion is substantially at odds with the analysis in *Loftin, supra,* which is present-

---

4. Securities fraud encompasses more than the value or manipulation of a particular security.

5. As noted above, this ruling will likely present awkward proof issues at trial and the need for limiting jury instructions.

ly on appeal. *Loftin* is not controlling, however, and is not persuasive on this issue.[6] Specifically, the Court notes that the *Loftin* court did not address the precise issue presented here with respect to the application of the PSLRA bar when non-related predicate acts are also alleged. In addition, the allegations in *Loftin* that the purpose of the alleged fraud was to induce the plaintiff "to invest in the transactions" runs contrary to the overall thrust of Plaintiff's allegations in this case to the effect that the purpose of the fraudulent scheme was simply to collect fees and expenses and to promote an improper tax avoidance strategy.

For the foregoing reasons, it is **respectfully recommended** that the motion be **granted, in part and denied, in part** as follows: The motion should be denied to the extent it seeks judgment on the pleadings, but **granted** to the extent it seeks to prohibit Plaintiff from relying upon any conduct set forth in Plaintiff's alleged predicate acts of mail fraud 2 and wire fraud 6 and 8 to establish a violation of section 1962. The practical effect of the Court's recommendation is to limit Plaintiff's RICO case to the remaining predicate acts. Because the Court does not recommend judgment on the pleadings with respect to the RICO claim, dismissal of the pendent state law counts is also inappropriate and the motion should be **denied** with respect to those counts.

### MOTION FOR SUMMARY JUDGMENT

KPMG moves for summary judgment on various issues relating to damages and liability. The Court has reviewed the motion (Doc. No. 155) and supporting memorandum (Doc. No. 156), the statement of material facts (Doc. No. 157), Plaintiff's opposition brief (Doc. No. 171), Plaintiff's statement of material facts (Doc. No. 172),

exhibits (Doc. No. 173), and exhibits filed under seal (Doc. No. 175 and Doc. No. S–2). For the reasons set forth herein, it is **respectfully recommended** that the motion be **denied.**

### Standard for Summary Judgment

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. Pro. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### Analysis

KPMG's motion seeks judgment on several grounds: 1) Plaintiff is barred from any damage recovery because a) taxes are assessed by the government and not KPMG, thus KPMG did not "cause" a levy of taxes and b) the Engagement Letter specifically disclaimed any guarantee of tax results; 2) Plaintiff may not recover interest on the taxes from KPMG, because

---

**6.** The Court notes *Loftin's* reliance on cases that are distinguishable from the factual sce- nario presented here.

"interest paid to the IRS is not damage," is offset by Plaintiff's use of the money, and is otherwise speculative; 3) because Plaintiff "voluntarily chose" to settle with the IRS, he may not recover as damage back taxes and interest; 4) the terms of the Engagement Letter provide that KPMG has no liability for incidental, special or consequential damages; 5) Plaintiff cannot recover the cost of the audit, because KPMG did not cause him to be audited; 6) KPMG is entitled to judgment on RICO, fraud and negligent misrepresentation claims because Plaintiff could not have reasonably relied on oral representations, when he received contrary written representations; and 7) Plaintiff's Florida Deceptive and Unfair Trade Practices Act ("DUTPA") claim is barred by the statute of limitations.

As support for these arguments, KPMG submits a three page "statement of material facts as to which there is no genuine issue for trial" (Doc. No. 157). Plaintiff has countered with his own "statement of material facts in dispute" (Doc. No. 172). Genuine issues as to material facts abound, precluding summary judgment on any of the issues presented.

With respect to the liability issues, for example, factual issues surround both the oral and written representations made to Plaintiff, precluding a summary determination on the "reasonable reliance" issue. While KPMG paints Jacoboni as a sophisticated investor, Jacoboni notes KPMG's touted expertise and KPMG's refusal to allow his accountant and lawyer to review the tax strategy. While KPMG relies heavily on the Engagement Letter, Plaintiff counters with evidence that contrary oral representations were made in order to induce his signature. To the extent KPMG would assert the bar of the parol evidence rule, such bar is inapplicable when fraud in the inducement is alleged, as here. *See Baggett v. Electricians Local*

*915 Credit Union*, 620 So.2d 784, 785–86 (Fla.1993). On this record, the reasonableness of Plaintiff's reliance on KPMG's representations, as well as the construction of the Engagement Letter itself, are jury issues.

KPMG argues that the four year statute of limitations bars the DUTPA claim, asserting that the statute (Fla.Stat. § 95.11(3)(f)) started running on March 23, 1998, citing to allegations in the Second Amended Complaint referring to the prior purchase of the warrant and stock. (Doc. No. 156 at 19–20). The DUTPA claim, however, as alleged in the Second Amended Complaint, encompasses more than just the transactions. The claim incorporates and re-alleges prior allegations 1–32, which set forth additional allegedly wrongful acts (including the preparation of the tax return in October 1998 and the failure to disclose the IRS investigation in 2001). As such, there is no factual support for KPMG's position that the DUTPA claim is time barred.

With respect to the damage issues, any ruling is premature, in view of the Court's above recommendation with respect to the RICO claim, the pendency of the interest abatement petition and the numerous factual issues surrounding the damage claim. For example, while it is correct that KPMG did not "cause" an audit and is not liable to pay Plaintiff's taxes to the IRS, Plaintiff has presented evidence that KPMG misrepresented its strategy to be "bullet-proof" and presented assurances that KPMG was "on the hook" if there was ever a problem with the IRS. The appropriate measure of damages payable to *Plaintiff* (as opposed to the IRS), should Plaintiff prevail, may well include reference to the tax liability actually incurred, although disputed issues of set-off and mitigation, including but not limited to Plain-

tiff's conduct and settlement with the IRS, remain to be resolved.

It is therefore recommended that the motion for summary judgment be **DENIED**.

### MOTION TO EXCLUDE

KPMG moves (Doc. Nos. 159, 160) to exclude the expert opinion of Bruce G. Dubinsky (Opinions 1 and 2 and Damage Opinions 1–5) as irrelevant and unreliable. Plaintiff opposes (Doc. Nos. 170, 174). According to his report, Dubinsky is a Certified Public Accountant, Certified Valuation Analyst, Certified Fraud Examiner, and Registered Investment Advisor Representative (Doc. No. S–2, Ex. 22) [7]. The Opinions, with the challenged portions italicized are set forth below.

Opinion 1 -

All investments share certain qualities and characteristics to some varied degree. The KPMG FLIP Tax Strategy lacked many of the characteristics of an investment. Further, *it was virtually impossible for an investor to earn a profit on the KPMG FLIP Tax Strategy after taking into account the various fees required by KPMG to be paid in connection with the FLIP Tax Strategy.*

Opinion 2 -

*The KPMG FLIP Tax Strategy lacked economic substance.*

KPMG's objects to these opinions, contending that they are not supported by economic analysis, but instead rely on hindsight. Such "results-oriented observations" are not, according to KPMG, appropriate expert testimony.

To the extent KPMG argues that Dubinsky conducted no analysis other than hindsight, the Court finds that the Report sets forth, in detail, the basis for the challenged opinions. *See* Report at 8–19. To the extent KPMG disagrees with this analysis or the conclusions drawn from the analysis, such is the fodder for cross-examination. KPMG's objections on this ground go to the weight and not the admissibility of the evidence and should thus be **overruled.**

KPMG objects to Opinion 2 on a separate ground, asserting that the opinion is irrelevant and misleading in that it is based on Dubinsky's factual finding that Plaintiff's involvement in the tax strategy "had [no] legitimate business purpose." *See* Doc. No. 159 at 2 and Report at 15. This, according to KPMG, is not an objective, economic analysis, but an opinion on Jacoboni's subjective intent, which is within the province of the jury. Doc. No. 160 at 3. The Court disagrees. As explained by Dubinsky in his Report, there is no evidence that Jacaranda was in business to provide goods or services; it was established in a tax haven; it had no business plan or identified source of revenue other than the pre-structured sale of the warrant; and it had a limited life span. Report at 15–17. None of these factors is a matter of Plaintiff's "subjective intent." This objection should be **overruled.**

Damage Opinion 1 [8]-

Based upon my review and analysis of the FLIP transaction and my review of the evidence in this matter and as described in my deposition testimony taken by KPMG in this matter on October

---

**7.** Although KPMG attaches a redacted Report to its brief, the Court reviewed and refers to the complete Report, which is filed under seal. To the extent KPMG has raised objections to the Report which require discussion of the redacted pages herein, the Court has attempted to be as circumspect as the circumstances allow.

**8.** The damage opinions are found in the Supplemental Report attached to the original Report and filed under seal.

15, 2003, it is my opinion that *KPMG caused Mr. Jacoboni to suffer benefit-of-the bargain damages in the amount of at least $9,702,245.*

Damage Opinion 2 -

Based upon my review and analysis of the FLIP transaction and my review of the evidence in this matter and as described in my deposition testimony taken by KPMG in this matter on October 15, 2003, it is my opinion that *KPMG caused Mr. Jacoboni to suffer out-of-pocket damages in the amount of at least $1,826,000.*

Damage Opinion 3 -

*KPMG caused Mr. Jacoboni to suffer substantial consequential damages in an amount that is continuing to grow and which to date is at least $90,000.*

Damage Opinion 4 -

*As a result of the alleged misconduct on the part of KPMG, Mr. Jacoboni should recover treble damages and attorneys fees pursuant to his RICO claim in this case.*

Damage Opinion 5 -

*As a result of the alleged fraudulent misrepresentations by KPMG, there is a possibility that punitive damages are just and proper and should be awarded in this case.*

KPMG argues that Damage Opinions 1-3 should be excluded as they are based on mere mathematical calculation, simply totaling the elements of the claimed damages. The Court finds this objection to be too simplistic a reading of Dubinsky's Supplemental Report. Whenever there is more than just one claimed element of damages, a certain amount of calculation is involved, for which an expert witness may be superfluous. But, as set forth in the basis of his opinion, Dubinsky's conclusions are based on more than simply his non-expert ability to add numbers. For example, Dubinsky's calculations necessarily include an analysis of the value of the tax strategy received as compared to the value of what was represented (Supplemental Report at 2-3) and the value of what was paid for the tax strategy compared to the value of what was actually received (Supplemental Report at 5-6). As for Damage Opinion 3, Dubinsky opines that consequential damages in a certain amount were proximately caused by the reliance of Mr. Jacoboni on the fraudulent misrepresentations of KPMG (Supplemental Report at 7). As Dubinsky's expertise in issues of valuation and fraud is considerable and unchallenged by KPMG (at least at this point), and the calculation of the damages involves a degree of expertise beyond that found in a mere calculator, the objections to Damage Opinions 1-3 should be overruled.

A different result is required as to Damage Opinions 4 and 5. KPMG correctly contends that Damage Opinions 4 and 5 are within the exclusive province of the Court and jury and not within this witness' expertise. The opinion that Plaintiff "should" recover treble damages and attorneys fees and that "there is a possibility that punitive damages are just and proper" are not based on any expertise, do not assist the Court or jury and are ultimate questions reserved for the factfinder. The Court recommends that the motion be **granted** with respect to these opinions.

It is therefore **respectfully recommended** that the motion to exclude the expert opinion of Bruce G. Dubinsky be **granted, with respect to damage opinions 4 and 5 and denied, in all other respects.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an

aggrieved party from attacking the factual findings on appeal.

February 5, 2004.