William H. SEIPPEL and Sharon A. Seippel, Plaintiffs,

v.

JENKENS & GILCHRIST, P.C.; Paul M. Daugerdas; Sidley, Austin, Brown & Wood, LLP; R.J. Ruble; Deutsche Bank, A.G.; and Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown, Defendants.

No. 03 Civ. 6942(SAS).

United States District Court, S.D. New York.

Aug. 25, 2004.

Blair C. Fensterstock, Maureen McGuirl, Josiah Greenberg, Fensterstock & Partners, L.L.P., New York City, for Plaintiffs.

Laurence M. Hill, Seth C. Farber, Dewey Ballantine, L.L.P., New York City, for Defendants Deutsche Bank AG and Deutsche Bank Securities.

Ann E. Schofield, McDermott, Will & Emery, New York, New York, Michael A. Pope, Douglas E. Whitney, McDermott, Will & Emery, Chicago, Illinois, Joseph A. Ginsburg, Levin & Ginsburg, Ltd., Chicago, Illinois, for Defendants Jenkens & Gilchrist and Paul Daugerdas.

Aaron R. Marcu, Darren L. Schlanger, Covington & Burling, New York, New York, Brad D. Brian, Bruce D. Abbot, Munger, Tolles & Olson, L.L.P., Los Angeles, California, for Defendant Sidley Austin Brown & Wood.

Stuart Abrams, Frankel & Abrams, New York City, for Defendant R.J. Ruble.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

This case arises out of tax and consulting services offered by several professional law, financial services and accounting firms. Plaintiffs, William and Sharon Seippel, filed this suit on September 10, 2003, alleging that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and are liable for damages and other relief arising from breach of fiduciary duty, inducing breach of fiduciary duty, fraud, negligent misrepresentation, breach of contract, malpractice, "unethical, excessive, illegal and unreasonable fees," and unjust enrichment.[1] The Seippels allege both federal question jurisdiction pursuant to 28 U.S.C. § 1331 and diversity jurisdiction pursuant to 28 U.S.C. § 1332. The Sidley Defendants and Deutsche Bank Defendants now move to dismiss.[2] The Sidley

---

1. Amended Complaint ("Compl.") ¶ 2.

2. The Sidley Defendants are Sidley Austin Brown & Wood, LLP, and R.J. Ruble. Sidley Austin Brown & Wood, LLP is the successor to Brown & Wood, LLP. R.J. Ruble is a former partner of Sidley Austin Brown & Wood. The Deutsche Bank Defendants are Deutsche Bank AG and Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex Brown. Plaintiffs have also brought claims against Jenkens &

Gilchrist, P.C. and its former Managing Shareholder Paul M. Daugerdas ("the Jenkens Defendants"). Collectively, the Jenkens Defendants and the Sidley Defendants are referred to as the "Lawyer Defendants." Unless otherwise specified, "defendants" refers to all defendants. Plaintiffs' claims against the Jenkens Defendants have been stayed. *See Denney v. Jenkens & Gilchrist*, No. 03 Civ. 5460, 2004 WL 1197251 (S.D.N.Y. May 19,

Defendants move in the alternative to strike the Seippels' prayer for damages to the extent it seeks recovery for back taxes, interest, and certain professional fees.

## II. BACKGROUND

### A. Defendants' Alleged Conspiracy

The following facts are drawn from the allegations in the Amended Complaint and the RICO Statement.[3] For the purpose of this motion, these allegations are assumed to be true.

Between 1996 and 2003, the Sidley Defendants, in concert with the Jenkens Defendants, were engaged in the development and promotion of a variety of tax shelters, including one labelled "Currency Options Bring Reward Alternatives," or "COBRA."[4] In late 1997 and 1998, the Sidley Defendants entered into an alliance to operate, market and promote these tax shelters with a number of other accounting and financial services firms, including, among others, the Deutsche Bank Defendants and Ernst & Young LLP.[5]

Pursuant to this alliance, each of the defendants authorized these firms to represent that the shelters were developed by the accounting firm soliciting the taxpayer, and that they had been independently "vetted" and determined to be "legitimate" and "conservative" by the Lawyer Defendants.[6] In fact, the shelters were developed by the Lawyer Defendants themselves.[7] The soliciting firms promised the taxpayers that the Lawyer Defendants would provide opinion letters attesting to the legitimacy of the shelters, and that these letters would "protect any participant from the imposition of penalties by tax authorities."[8]

Though these letters were "canned" and required little additional work, the Lawyer Defendants charged substantial fees, cal-

---

2004). Before the claims against the Jenkens Defendants were stayed, the Jenkens Defendants also moved to dismiss. Because the remaining parties incorporate arguments made in and in response to the Jenkens Defendants' briefs in support of their motion, those briefs will sometimes be referred to in this decision.

3. Pursuant to my Individual Rules, a party asserting a RICO claim must file a RICO Statement describing in detail the activities giving rise to the claim. The Seippels filed the RICO Statement on February 10, 2004. For purposes of a motion to dismiss, the RICO Statement is treated as part of the complaint. See Manhattan Telecomms. Corp. v. DialAmerica Mktg., 156 F.Supp.2d 376, 380 (S.D.N.Y.2001).

4. The essential features of the COBRA transaction, as described by the plaintiffs, were as follows. First, the taxpayer sells a short option and purchases a long option in almost identical amounts on a foreign currency exchange with different strike prices, both to expire in thirty days. Second, the taxpayer contributes his or her options to a general partnership formed for the purpose of conducting the COBRA transaction. After thirty days, the options expire, resulting in either a gain or a loss. Third, the taxpayer makes a capital contribution consisting of cash or other capital assets to the partnership. Fourth, the taxpayer contributes his or her interest in the partnership to an S corporation formed for this purpose, causing the termination of the partnership. Finally, the S corporation sells the capital assets contributed by the taxpayer. Because the basis of the taxpayer's interest in the partnership is increased by the purchase cost of the long options, but not decreased by the premium earned on the sale of the short options, upon the contribution of the partnership interests to the S corporation and the sale by the S corporation of its capital assets, the S corporation realizes a large loss that reduces the taxpayer's liability. See Compl. ¶¶ 55–57.

5. See id. ¶¶ 3, 17–54.

6. Id. ¶¶ 3, 4, 137.

7. See id. ¶¶ 17, 21. See also RICO Statement ("RICO Stmt.") at 29.

8. Compl. ¶ 60.

culated as a percentage of the capital losses each client would claim on its tax returns.[9] The defendants agreed that on some transactions, the Jenkens Defendants would provide the first opinion letter and take the "lion's share" of the fees, and the Sidley Defendants would provide a secondary letter and receive a smaller fee, while on other transactions the positions would be reversed.[10]

The Lawyer Defendants' undisclosed role in marketing and promoting the shelters both compromised their objectivity, and "presented a risk that the [tax authorities] would and could claim that the opinion letters ... would not shield them from the assessment of penalties."[11] The defendants agreed that "the firms soliciting prospective participants ... would overstate what those opinion letters would conclude regarding the legitimacy of the tax scheme being promoted and would understate its risks and the likelihood of an audit."[12] The defendants further agreed that the taxpayer would not receive the opinion letters until after it had engaged in the promoted transactions.[13] Finally, defendants agreed that the accounting firms soliciting taxpayers would represent that the tax shelter "was a 'proprietary' product of that firm so ... prospective participants could not take it to their own attorney or accountant for an opinion as to its legitimacy."[14]

The Seippels contend that "defendants either knew or should have known from the outset that the COBRA tax shelter would not pass muster with the IRS or the Virginia tax authorities."[15] In support of this allegation, the Seippels point to two Internal Revenue Service rulings, IRS Notice 1999–59 and Notice 2000–44, and to a decision of the Third Circuit Court of Appeals, *ACM Partnership v. Commissioner.*[16] Notice 1999–59, released in December 27, 1999, stated that "certain types of transactions ... that are being marketed to taxpayers for the purpose of generating ... artificial losses are not allowable for federal income tax purposes."[17] Notice 2000–44, released on September 5, 2000, "specified [that] the precise transaction marketed ... as the COBRA transaction" was not properly allowable for tax purposes.[18] Nevertheless, defendants continued to market the transactions.[19]

### B. The Seippels' COBRA Transaction

William Seippel was approached by Ernst & Young in late 1999 in connection with one of the defendants' tax shelters. Mr. Seippel, a senior executive at a Virginia company, was planning to change his employment, exercise his stock options and sell the resulting stock. Ernst & Young was Mr. Seippel's employer's auditor, and provided "tax advice, and other financial services" to Mr. Seippel and other senior executives of the company.[20] Through this relationship, Ernst & Young "knew of Mr. Seippel's plans and the substantial gains that the Seippels would have to recognize

---

9. *See id.* ¶ 137.

10. *Id.* ¶ 61.

11. *Id.* ¶ 142.

12. RICO Stmt. at 7, 18 n. 10.

13. *See* Compl. ¶ 60.

14. RICO Stmt. at 15.

15. Compl. ¶ 5.

16. 157 F.3d 231 (3d Cir.1998). *See* Compl. ¶¶ 115–122.

17. Compl. ¶ 117 (quoting Notice 1999–59).

18. *Id.* ¶ 122.

19. *See id.* ¶ 47.

20. *Id.* ¶ 63.

upon engaging in the Stock Options Transaction and the resulting tax liability."[21] Acting on this knowledge, Charles Paul of Ernst & Young approached the Seippels, pursuant to the defendants' scheme, to "advis[e] them that a lawful strategy named [COBRA] could drastically reduce the tax liability that would otherwise result from Mr. Seippel's engaging in the Stock Options Transaction."[22]

The Seippels had a series of meetings and telephone and email conversations with Paul in late 1999, during which Paul represented that "COBRA was 100 percent legitimate, and backed by two blue chip law firms (Jenkens & Gilchrist and Brown & Wood) [and] was not only completely legal and based on 'loopholes' created by the IRS, but actually was 'conservative.' "[23] Paul represented that the COBRA shelter had been developed by Ernst & Young, not by the Lawyer Defendants. Paul told the Seippels that the Lawyer Defendants would provide opinion letters confirming the propriety of the COBRA transaction, and represented that these letters would "in the event of any IRS audit ... enable the Seippels to satisfy the IRS auditors as to the propriety of the tax returns [and] would serve as a protection against the imposition of tax penalties."[24]

At some point in late 1999, after being contacted by Ernst & Young, Mr. Seippel sold his stock and realized a large gain.[25] During the same period, the Seippels agreed to participate in the COBRA transaction to reduce their tax liability for that gain. Mr. Seippel formed various entities, including an S corporation, WSWP Virginia Investors, Inc. ("WSWP"), a limited liability company, WHS LLC ("WHS") and a partnership, WSWP Partners, to engage in the transaction. On December 1, 1999, WHS entered into the currency options transaction described above, purchasing long options and selling short options on foreign currency exchanges. WHS used Deutsche Bank to conduct the transactions. The options had an expiration date of December 23, 1999. On December 2, 1999, Mr. Seippel, through WHS, contributed his currency options to WSWP Partners. On December 12, 1999, WSWP Partners made a purchase of Canadian dollars. On December 27, 1999, Mr. Seippel contributed his interest in WSWP Partners to WSWP. WSWP Partners was liquidated, and the Canadian dollars were distributed to WSWP. On December 29, WSWP sold all of its investment in the Canadian dollars.[26]

In February 2000, Mr. Seippel received an opinion letter from Jenkens and Gilchrist "stating that the Seippels could properly and legally claim losses totaling $12,000,000 on their tax returns as a result of the COBRA transaction."[27] In March 2000, Mr. Seippel received a similar opinion from Brown & Wood, stating that "the IRS should not be successful were it to assert a penalty ... for positions taken in [the Seippels'] U.S. Federal income tax [returns] with respect to the [COBRA] transactions."[28] The Jenkens & Gilchrist opinion letter stated that IRS Notice 1999–59, released on December 27, 1999, did not apply to COBRA. The Brown & Wood

21. Id. ¶ 64.

22. Id. ¶ 65.

23. Id. ¶ 68.

24. Id. ¶ 77.

25. The Amended Complaint does not specify the precise timing or the size of the stock transaction.

26. See id. ¶¶ 88–106.

27. Id. ¶ 107.

28. Id. ¶ 112.

opinion letter did not mention the Notice, nor did any other communication from defendants to the Seippels apart from the Jenkens & Gilchrist opinion letter. The defendants never informed the Seippels about IRS Notice 2000–44, released on September 5, 2000.[29]

The Seippels paid the Jenkens Defendants $338,880 for their opinion letter, legal advice and assistance in establishing the entities required to carry out the COBRA transaction. This fee was calculated as a percentage of the $12,000,000 in losses created by the transaction.[30] The Seippels paid Brown & Wood $21,180 for the second opinion letter.[31] The Seippels contend that both payments were "unethically excessive," because the letters were "canned" and the lawyers "expended little, if any, time or effort" in creating them.[32]

Ernst & Young prepared the Seippels' 1999 and 2000 tax returns. These returns used the COBRA losses to offset and reduce the Seippels' tax liability.[33]

In March 2002, Ernst & Young informed Mr. Seippel that it had received subpoenas in an IRS investigation of COBRA.[34] In July 2002, the Seippels retained new tax and legal advisors, and discovered the alleged fraud for the first time.[35] The Seippels allege that they have paid and will continue to incur substantial damages in the form of fees paid to these new advisors retained to "rectify ... Defendants' wrongdoing."[36] The Seippels' 1999 and 2000 tax returns have been audited by the IRS and Virginia tax authorities, and the Seippels have "had to make tax payments in an amount exceeding $5 million they were promised they would not have to make" and "have paid interest and/or penalties ... totaling over $1 million and owe additional such amounts."[37] The Seippels also allege various other injuries, including losses caused by having liquidated assets at fire sale prices to meet their tax obligations, and the loss of alternative legitimate tax savings.[38]

## III. LEGAL STANDARD

A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."[39] At the motion to dismiss stage, the issue "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test."[40]

A complaint need not state the legal theory, facts, or elements underlying the claim except in certain instances. Pursuant to the simplified pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure, "a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[41] In contrast, the heightened pleading standard of Rule 9(b) requires

29. See id. ¶¶ 117–124.

30. See id. ¶ 107.

31. See id. ¶ 110.

32. Id. ¶¶ 213–218.

33. See id. ¶¶ 113, 114, 126.

34. See id. ¶ 133.

35. See id. ¶ 134.

36. Id. ¶ 208.

37. Id. ¶¶ 163, 208–209.

38. See id. ¶ 4.

39. Weixel v. Board of Educ. of New York, 287 F.3d 138, 145 (2d Cir.2002) (quoting Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (alterations omitted)).

40. Phelps v. Kapnolas, 308 F.3d 180, 184–85 (2d Cir.2002) (quotation omitted).

41. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Rule 8(a)(2)).

that in claims of fraud or mistake "the circumstances constituting fraud or mistake shall be stated with particularity." [42]

The task of the court in ruling on a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof." [43] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. [44]

## IV. DISCUSSION

### A. Ripeness

■ The Deutsche Bank Defendants argue that the Seippels' claims are not ripe, because there has been no final resolution of the Seippels' dispute with the IRS and Virginia tax authorities. [45] This argument is unavailing. The fact that the Seippels may not ultimately owe the tax authorities additional taxes does not mean that their action is not ripe. The Seippels allege that they have been damaged, and continue to be damaged, as a result of defendants' conduct. Their damages include the fees paid to defendants, losses incurred in the COBRA transactions, expenses paid to accountants and attorneys that are assisting the Seippels in defending the audits, losses caused as a result of being forced to sell

assets at distressed prices to meet tax obligations, and tax penalties already assessed and paid. [46] These injuries are immediate and definite, and therefore satisfy the case or controversy requirement contained in Article III of the Constitution. [47] Moreover, those damages which remain contingent—penalties, taxes and interest that may be assessed in the future, and professional fees that may be incurred—are the appropriate subject of the Seippels' claim for declaratory relief. [48]

### B. RICO Claims

The Seippels assert RICO claims against all defendants. RICO provides for civil and criminal liability for entities engaged in "a pattern of racketeering activity." [49] A person who suffers injury as a result of a RICO violation may sue an entity pursuant to 18 U.S.C. § 1964. To demonstrate a "pattern" of racketeering activity, a plaintiff must show at least two predicate acts of racketeering activity occurring within a ten-year period. [50]

Defendants contend that Section 107 of the Private Securities Litigation Reform Act ("PSLRA") of 1995, [51] bars the Seippels' RICO claim because the alleged predicate acts describe conduct that would have been actionable as securities fraud. The PSLRA amended RICO to provide that "no person may rely upon conduct that

---

42. Fed.R.Civ.P. 9(b).

43. *Pierce v. Marano*, No. 01 Civ. 3410, 2002 WL 1858772, at *3 (S.D.N.Y. Aug.13, 2002) (quotation marks and citations omitted).

44. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

45. *See* Memorandum of Law of Deutsche Bank Defendants in Support of Motion to Dismiss ("Deutsche Bank Mem.") at 2–4.

46. *See* Compl. ¶ 176.

47. *See Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 81, 98 S.Ct. 2620,

57 L.Ed.2d 595 (1978) ("To the extent that issues of ripeness involve ... the existence of a live 'Case or Controversy,' [a] conclusion that [the complaining party] will sustain immediate injury ... and that such injury would be redressed by the relief requested would appear to satisfy this [constitutional] requirement.") (quotation and citations omitted).

48. *See infra* Part IV.E.

49. 18 U.S.C. § 1961(a)-(d).

50. 18 U.S.C. § 1961(5).

51. Pub.L. No. 104–67, § 107.

would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." [52] "In amending RICO, Congress was clear in stating that the PSLRA 'was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim.'" [53]

■ Here, the predicate acts alleged are "transmitting fraudulent information and materials through the interstate mails and wires, as well as otherwise using the interstate mails and wires in furtherance of a common plan to commit racketeering activity." [54] The Seippels characterize the defendants' and Ernst & Young's telephone, internet and mail communications with them and other "victims," and their communications amongst themselves to organize their alliance, as predicate acts of mail and wire fraud. [55]

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." [56] The Supreme Court has recently explained that the phrase 'in connection with' in section 10(b) should be "construed 'not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes.'" [57]

Defendants do not argue that the Seippels' currency option trades constitute the purchase or sale of securities. [58] Rather, the Deutsche Bank Defendants argue that the conduct alleged by the Seippels would have been actionable as securities fraud because "Plaintiffs assert that they were defrauded in connection with the exercise of Plaintiff William Seippel's stock options and subsequent stock sales." [59] As the Deutsche Bank Defendants characterize the Seippels' allegations,

**52.** 18 U.S.C. § 1964(c).

**53.** *Jordan (Berm.) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F.Supp.2d 243, 248 (S.D.N.Y. 2002) (quoting *Mezzonen v. Wright*, No. 99 Civ. 9380, 1999 WL 1037866, at *4 (S.D.N.Y. Nov.16, 1999)). *See also* Joint Explanatory Statement of the Committee of Conference, in H.R. Conf. Rep. No. 104–369, reprinted in 1995 U.S.C.C.A.N. 730, 746 ("The Conference Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.").

**54.** RICO Stmt. at 41.

**55.** *See id.* at 41–72.

**56.** 15 U.S.C. § 78j.

**57.** *SEC v. Zandford*, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)).

**58.** The Sidley Defendants draw the Court's attention to the opinions of four district courts in somewhat related cases, each ruling that the PSLRA bars plaintiffs' RICO claims. These opinions, of course, are not binding on this Court. It appears that in each of these cases, the tax shelter scheme at issue ("FLIP" or "BLIPS"), unlike COBRA, involved transactions in publicly traded securities. The facts alleged in these cases are therefore significantly different. *See Loftin v. KPMG, LLP*, No. 02–81166–Civ, 2003 WL 22225621 (S.D.Fla. Sept.10, 2003); *Swartz v. KPMG, LLC, et al.*, No. C03–1252P (W.D.Wash. Feb. 13, 2004); *Schneider v. KPMG, LLP, et al.*, No. 6:04–cv–55–Orl–31 (M.D.Fla., Apr. 12, 2004); *Jacoboni v. KPMG, LLP*, 314 F.Supp.2d 1172 (M.D.Fla.2004).

**59.** Deutsche Bank Mem. at 5–6. The Sidley Defendants argue for the application of the PSLRA on the ground that the Seippels' allegations are actionable as securities fraud because of WSWP's issuance of stock to Mr. Seippel as a step in the COBRA transaction. Because the PSLRA applies to bar the RICO claims for the reasons discussed, there is no need to consider this alternative argument.

(i) Ernst & Young learned of Plaintiff's plans to leave his company and desire to 'exercise his valuable stock options before leaving and then séll the resulting stock,' (ii) Ernst & Young exploited this knowledge and persuaded Plaintiffs to implement the COBRA strategy that 'could drastically reduce the tax liability that would otherwise result from Mr. Seippel's engaging in the Stock Options Transaction,' and (iii) they engaged in the stock options transaction while relying upon the tax benefits of COBRA, as purportedly misrepresented by Ernst & Young.[60]

The Seippels argue that this conduct would not have been actionable as securities fraud because they have not alleged that any defendant made any misrepresentations as to the value of Mr. Seippel's stock options. While it is true that "[i]n general, the 'in connection with' element is met when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value,"[61] it is not a requirement. In *SEC v. Zandford,* the Supreme Court held that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."[62] Instead, *Zandford* held that it is "enough that the scheme to defraud and the sale of securities coincide."[63]

The Seippels also argue that the alleged conduct would not be actionable as securities fraud because they have not claimed that Mr. Seippel decided to exercise his stock options in reliance on defendants' representations. Properly read, however, the Amended Complaint describes a single fraudulent scheme 'in connection with' the sale of Mr. Seippel's stock. The Seippels allege that each of the steps in the COBRA transaction was part of a single fraudulent scheme. The sale of that stock was an integral part of the scheme, as without it there would have been no gain for the COBRA transaction to offset. Indeed, the Seippels have alleged that defendants only approached Mr. Seippel because they knew of the planned sale of stock.[64] Having alleged in their Amended Complaint that defendants' acts were part of a single fraudulent scheme, the Seippels cannot now divide the scheme into its various component acts. "Allowing such surgical presentation of the cause of action here would undermine the congressional intent behind the RICO Amendment."[65]

Under *Zandford,* all that is required for a section 10(b) violation is that the scheme to defraud and the sale of securities coincide. In the *Zandford* opinion, the Supreme Court circumscribed the breadth of its holding by providing examples of cases in which the fraud and the sale of securities would *not* coincide: where "*after* a lawful transaction had been consummated, a broker decided to steal the proceeds [or] a case in which a thief simply invested the proceeds of a routine conversion in the stock market."[66] The Court described

---

**60.** *Id.* at 5 (quoting Compl. ¶¶ 64, 65).

**61.** *Araujo v. John Hancock Life Ins. Co.,* 206 F.Supp.2d 377, 383 (E.D.N.Y.2002) (quotation omitted).

**62.** *Zandford,* 535 U.S. at 820, 122 S.Ct. 1899. *See also A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir.1967) ("it is established that a 10b–5 action will survive even though the fraudulent scheme or device is unrelated to 'investment value' ").

**63.** *Zandford,* 535 U.S. at 820, 122 S.Ct. 1899.

**64.** *See* Compl. ¶ 64.

**65.** *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,* 189 F.3d 321, 330 (3d Cir.1999).

**66.** *Zandford,* 535 U.S. at 820, 122 S.Ct. 1899 (emphasis added).

those examples as cases in which the sale of securities and the fraud were "independent events." [67] The obvious implication is that where the fraud and the sale of securities are "less tangentially related," or more closely dependent on each other, the 'in connection with' requirement is satisfied.[68]

There is no question here that defendants' alleged scheme, which dates back to 1996, coincided temporally with the sale of Mr. Seippel's stock. The Seippels have alleged that defendants were engaged in a fraudulent scheme before, during and after the stock transaction. The stock transaction was integrally related to the fraudulent scheme. Defendants contacted the Seippels, as part of their scheme, precisely because of his sale of stock, and took advantage of their knowledge of Mr. Seippel's planned securities transaction to induce him to take part in the COBRA transaction. As in *Zandford*, "[t]he securities sales and [defendants'] fraudulent practices were not independent events." [69] Because these allegations are actionable as a securities fraud, the Seippels cannot rely on them as the basis for a RICO claim.

The Seippels' RICO claims are therefore dismissed.[70]

## C. The State Law Claims Against the Sidley Defendants

### 1. Malpractice

The Seippels assert malpractice claims (styled as "negligent misrepresentation/professional malpractice" and "breach of contract/professional malpractice") against the Sidley Defendants. The Sidley Defendants argue that these claims are time-barred.

■ "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply New York choice-of-law rules and statutes of limitations." [71] Under New York's borrowing statute, where a plaintiff who is not a resident of New York sues based upon a cause of action that accrued outside New York, the court must apply the shorter limitations period of either New York or the state where the cause of action accrued.[72] New York courts interpreting the borrowing statute hold that the cause of action accrues in the place of the injury, and "[w]here an injury is purely economic, the place of injury is usually where the plaintiff resides and sustains the economic impact of the loss." [73] The Seippels were

---

67. *Id.*

68. *Jacoboni*, 314 F.Supp.2d at 1179. As noted, *Jacoboni* differs from the present case, in that the *Jacoboni* court held defendant's fraud was in connection with the securities transactions that the FLIP strategy used to create losses, whereas here, defendants' fraud was in connection with the sale of Mr. Seippel's stock. The reasoning behind *Jacoboni*, however, is relevant here. In that case, too, the alleged misrepresentations related to the legitimacy of the tax shelter, not to the value of the securities. The *Jacoboni* plaintiffs, like the Seippels, argued that the securities transactions were merely incidental to the fraudulent scheme, the purpose of which was "tax advice fraud." *Id.* at 1180. The *Jacoboni* court nevertheless found that the misrepresentations were "sufficiently connected to" and "coincident with" the sales of securities. *Id.* at 1179.

69. *Zandford*, 535 U.S. at 820, 122 S.Ct. 1899.

70. As the PSLRA bar disposes of the Seippels' RICO claims, there is no need to rule on whether the Seippels properly alleged each element of a RICO claim.

71. *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir.1998) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 108–09, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).

72. *See* N.Y. C.P.L.R. § 202 (McKinney 2003).

73. *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999).

residents of Virginia when their claims arose. The Virginia statute of limitations for legal malpractice is five years when there is a written contract.[74] The Seippels have clearly brought their action within Virginia's limitations period. The issue here is whether the action is timely within New York's shorter period of limitations.

■ New York's statute of limitations for legal malpractice is three years, regardless of whether the underlying theory is based in contract or tort.[75] The claim accrues "when all the facts necessary to the cause of action have occured and an injured party can obtain relief in court."[76] The claim accrues "even if the aggrieved party is then ignorant of the wrong or injury."[77]

The Seippels argue that their malpractice claim accrued, at the earliest, in July 2002, when they hired new counsel and accountants to investigate the propriety of their 1999 tax returns. Prior to that time, the Seippels argue, they had suffered no damages and so had no cause of action for malpractice.[78]

The Seippels' argument is at odds with the holding of *Ackerman v. Price Waterhouse.* The *Ackerman* court held that a claim against accountants for malpractice in the preparation of tax returns accrues when plaintiffs first receive and rely on the defendant's work product and "as a consequence of such reliance, can become liable for tax deficiencies."[79] The court rejected the argument that the claim could only accrue if and when the IRS assesses a deficiency, in favor of a "precise accrual date that can be uniformly applied."[80] The *Ackerman* rule has been applied to malpractice claims against attorneys.[81] The Seippels' malpractice claims against the Sidley Defendants thus accrued "on or about March 9, 2000," when they received and relied on Brown & Wood's opinion letter.

■ The Seippels offer two arguments for tolling the statute of limitations on their malpractice claims. *First,* they argue that the Lawyer Defendants should be estopped from asserting the statute of limitations defense because of their attempt to "wrongfully induce the plaintiff to refrain from timely commencing an action by deception [and] concealment."[82] But "New York courts have rejected the proposition that fraudulent concealment tolls the statute of limitations in non-medical malpractice cases."[83]

74. *See Shipman v. Kruck,* 267 Va. 495, 501, 593 S.E.2d 319 (2004); Va.Code Ann. § 8.01–230 (2004).

75. *See* N.Y. C.P.L.R. § 214(6).

76. *Ackerman v. Price Waterhouse,* 84 N.Y.2d 535, 541, 620 N.Y.S.2d 318, 644 N.E.2d 1009 (1994).

77. *Id.*

78. *See* Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss filed by Jenkens Defendants ("Pl.Opp.Jenkens") at 4.

79. *Ackerman,* 84 N.Y.2d at 541, 620 N.Y.S.2d 318, 644 N.E.2d 1009.

80. *Id.*

81. *See, e.g., McCoy v. Feinman,* 99 N.Y.2d 295, 301, 755 N.Y.S.2d 693, 785 N.E.2d 714 (2002); *Proskauer Rose Goetz & Mendelsohn, L.L.P. v. Munao,* 270 A.D.2d 150, 151, 704 N.Y.S.2d 590 (1st Dep't 2000); *Tal–Spons Corp. v. Nurnberg,* 213 A.D.2d 395, 397, 623 N.Y.S.2d 604 (2d Dep't 1995). *See also Adamson v. Bachner,* No. 01 Civ. 10213, 2002 WL 31453096, at *2 (S.D.N.Y. Oct.31, 2002).

82. Pl. Opp. Jenkens at 9.

83. *Zhadanov v. Gold & Wachtel,* No. 99 Civ. 5900, 2000 WL 1469840, at *4 (S.D.N.Y. Sept.29, 2000) (citing *Tulloch v. Haselo,* 218 A.D. 313, 218 N.Y.S. 139, 142–42 (3d Dep't 1926); *Siegel v. Kranis,* 52 Misc.2d 78, 274 N.Y.S.2d 968, 970 (Sup.Ct. Kings Co.1966)).

■ *Second,* the Seippels argue that the statute should be tolled because the Lawyer Defendants' "Failure To Fulfill Their Duty To Correct Their Advice To Plaintiffs Created A Continuous Wrong."[84] This argument also fails. The theory that a malpractice claim based on false tax advice given in 2000 does not accrue so long as it remains uncorrected is clearly incompatible with the theory of *Ackerman.*[85] Indeed, in *McCoy v. Feinman,* applying *Ackerman,* the New York Court of Appeals explicitly held that a continuing failure to correct malpractice could not toll the statute: "our law cannot permit a limitations period to depend on a continuing omission that can go on for decades."[86]

The Seippels' malpractice claim is time-barred, and the statute of limitations cannot be tolled. The claim must therefore be dismissed.

### 2. Negligent Misrepresentation, Breach of Contract, and Breach of Fiduciary Duty Claims

The Sidley Defendants contend that because all of the Seippels' state law claims "merge" into the malpractice claim, they too are time-barred. The Seippels appear to contest this argument only with regard to their claim of fraud. For the reasons given below, all of the Seippels' state law claims other than their fraud claim merge into the malpractice claim and are time-barred.

■ The Seippels' breach of fiduciary duty claim against the Sidley Defendants is duplicative of their legal malpractice claim. The claim arises from the same conduct—the Sidley Defendants' breach, "as Plaintiffs' attorneys [of] the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility"[87]—and involves no distinct damages. Accordingly, the claim cannot be separately maintained.[88] To the extent the Seippels assert "negligent misrepresentation" as a separate claim from "malpractice," that claim must also be dismissed as duplicative, for the same reason.

■ An action for breach of contract in an attorney-client relationship may be maintained separately from a malpractice action only where the attorney has undertaken to perform a specific task and failed to do so: "a breach of contract claim premised on the attorney's failure to exercise due care or to abide by general professional standards is nothing but a redundant pleading of the malpractice claim."[89] Here, the Seippels allege only that the

---

84. Pl. Opp. Jenkens at 12.

85. *Ackerman,* 84 N.Y.2d at 541, 620 N.Y.S.2d 318, 644 N.E.2d 1009. The Seippels rely on several cases, all of which are inapposite. In *Lama Holding Co. v. Shearman & Sterling,* 758 F.Supp. 159 (S.D.N.Y.1991), for example, plaintiffs did not allege that the original advice given in 1982 in connection with the creation of an offshore corporation was faulty; the alleged malpractice was the law firm's failure, in 1986, to inform the client of subsequent relevant changes in the law. The malpractice claim in that case therefore did not accrue until 1986.

86. *McCoy,* 99 N.Y.2d at 306, 755 N.Y.S.2d 693, 785 N.E.2d 714. The Seippels' contention that Virginia law should govern this issue

is baseless. The question is whether New York's statute of limitations may be tolled by a continuing failure to correct malpractice, and the court must look to New York law for its answer.

87. Compl. ¶ 168.

88. *See Mecca v. Shang,* 258 A.D.2d 569, 570, 685 N.Y.S.2d 458 (2d Dep't 1999) (dismissing breach of fiduciary duty, negligent misrepresentation, gross negligence, and fraud claims "since these claims ... arise from the same facts as [plaintiff's] legal malpractice claim and do not allege distinct damages").

89. *Sage Realty Corp. v. Proskauer Rose L.L.P.,* 251 A.D.2d 35, 38–39, 675 N.Y.S.2d 14 (1st Dep't 1998).

Sidley Defendants entered into a contract to provide professionally competent services and to exercise applicable standards of care, loyalty and honesty, and "instead provided the Seippels with advice that [they] either knew or should have known to be wrong."[90] The breach of contract claim is redundant and therefore must be dismissed.

### 3. Fraud

■ As a threshold matter, the Sidley Defendants contend that the Seippels' fraud claims against them also merge into the malpractice claims (and so are time-barred). The Sidley Defendants characterize the fraud and malpractice claims as "virtually identical, relying upon exactly the same allegedly false statements."[91]

As noted earlier, a court must construe the complaint liberally on a motion to dismiss. Insofar as the Seippels' claim of fraud rests on misrepresentations in the Sidley Defendants' opinion letter, made in the course of an attorney-client relationship, it might be considered duplicative of the malpractice claim. But that is not the only basis for the Seippels' fraud claim. The Amended Complaint alleges that the Sidley Defendants caused Ernst & Young to make fraudulent misrepresentations to the Seippels in November 1999 in order to induce the Seippels to engage in a COBRA transaction. The Seippels did not retain the Sidley Defendants until March 2000, by which time they had already completed, and suffered losses on, the COBRA trans-

action.[92] The Seippels do not allege that an attorney-client relationship existed prior to that point. The Amended Complaint thus states a claim for fraud based on distinct conduct from that on which the Seippels' malpractice claim is based.

■ Under New York choice of law rules, the locus of a fraud is the place where the injury was inflicted.[93] The injury in this case was inflicted in Virginia, where the Seippels reside. Under New York's borrowing statute, the shorter of the limitations periods of Virginia and New York must be applied. Under the shorter limitations period, that of Virginia, an action for fraud is timely if filed within two years of discovery.[94] Because the Seippels allege that they discovered the fraud in 2002, their action is timely.

■ To resolve choice of law issues in tort cases, New York applies an "interest analysis" to identify the state that has the greatest interest in the litigation.[95] When a choice of law issue relates to laws regulating conduct, such as fraud, the locus of the tort determines the applicable law.[96] Because the Seippels' injuries occurred in Virginia, Virginia law applies to their fraud claim. Under Virginia law, in an action to recover damages for fraud, "the plaintiff must prove a false representation, of a material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage."[97]

---

90. Compl. ¶¶ 202–203.

91. Memorandum of Law of Sidley Defendants in Support of Motion to Dismiss ("Sidley Mem.") at 14.

92. RICO Stmt. at 60.

93. *See Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996) (citing *Smith Barney, Harris Upham & Co. v. Luckie,* 85 N.Y.2d 193, 207, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (1995)).

94. Va.Code Ann. §§ 8.01–248, 249.

95. *See Krock,* 97 F.3d at 645.

96. *See AroChem Int'l Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992).

97. *ITT Hartford Group, Inc. v. Virginia Fin. Assocs., Inc.,* 258 Va. 193, 203, 520 S.E.2d 355 (1999).

Moreover, fraud actions are subject to the heightened pleading requirements of Rule 9(b). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." [98] A complaint alleging fraud must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." [99] "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." [100] Rule 9(b) is intended "to provide a defendant with fair notice of plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." [101] Accordingly, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. [102] Allegations of fraud may not be based upon information and belief, except as to matters peculiarly within the opposing party's knowledge; in such a case, the allegations must be accompanied by a statement of the facts upon which the belief is founded. [103]

■■■ The Amended Complaint and the RICO Statement offer a number of examples of misrepresentations or omissions of material fact by Charles Paul of Ernst & Young. The Seippels have specified the alleged fraudulent statements in sufficient detail. They have identified Paul as the speaker of each statement, and stated where and when each statement was made. [104]

Some of the representations the Seippels cite may not constitute actionable fraud. For example, Paul's representation that "engaging in COBRA would not subject the Seippels to tax penalties" may be a statement of opinion as to future events, which is not actionable. [105] The Seippels have failed to explain why other statements are fraudulent. It is not at all clear, for instance, why Paul's statement that "COBRA had been developed for a 'select audience' of individuals who had generated significant gains or income" is characterized as a "misrepresentation." [106] Even without these statements, however, the Seippels have clearly provided sufficient examples of misrepresentations or material omissions from which to infer fraudulent intent.

For example, Paul allegedly informed the Seippels that COBRA was developed by Ernst & Young, and failed to disclose the role of the Lawyer Defendants in de-

**98.** Fed.R.Civ.P. 9(b).

**99.** *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)).

**100.** *DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987).

**101.** *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

**102.** *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995).

**103.** *See Novak v. Kasaks,* 216 F.3d 300, 312 (2d Cir.2000).

**104.** The Amended Complaint alleges that Paul made his misleading statements "[d]uring several meetings in the Seippels [sic] home and in telephone conversations with and emails to Mr. Seippel that took place in [November and December] 1999." Compl. ¶ 66.

**105.** *See Tate v. Colony House Builders, Inc.,* 257 Va. 78, 83, 508 S.E.2d 597 (1999).

**106.** RICO Stmt. at 43. This statement may be more akin to puffery than to an actionable misrepresentation.

veloping and promoting COBRA, in order to give the impression that the Lawyer Defendants were exercising independent judgment.[107] Paul did not disclose that the Lawyer Defendants' role in developing and promoting COBRA might limit the Seippels' ability to use their opinion letters to protect against tax penalties.[108] Additionally, Paul represented that COBRA was "100 percent legitimate," while failing to disclose authority to the contrary.[109] This statement might be considered a false representation as to existing facts, *i.e.* the failure to disclose existing authority holding COBRA to be illegitimate.[110] The Seippels have alleged that Paul's statements were false when made, and that defendants knew of their falsity when they caused Paul to make them.[111]

The Sidley Defendants point out that these statements were not made by Brown & Wood or its employees. Paul's statements, however, are imputed to the Sidley Defendants because the Seippels allege that Paul made these statements "acting at the behest and with the knowledge and authority of" the Sidley Defendants.[112] The Seippels have adequately alleged the nature of the relationship between the Sidley Defendants and Ernst & Young and Paul, and have described the role played by the Sidley Defendants in the alleged

scheme.[113] The Seippels' allegations are sufficient, given that the details of the scheme are peculiarly within defendants' knowledge.[114]

The Sidley Defendants also argue that the Seippels could not reasonably rely on Paul's oral representations because the Lawyer Defendants' opinion letters cautioned them that their contents were not binding on the IRS or the courts, and stated only that there was a "greater than 50% likelihood" that the transactions would be upheld if challenged.[115] But whether or not the letter clearly contradicted Paul's statements, it was not delivered until after the Seippels had entered into and suffered losses on the COBRA transactions in reliance on Paul's statements. Even if the letter clearly contradicted Paul's statements, the Seippels would still have a claim for the losses incurred in participating in COBRA.

Moreover, it is not clear that the opinion letter does contradict Paul's statements. It is not obvious that the cautious, ambiguous phrasing of the opinion letter (which precedes virtually all of its conclusions with "it is more likely than not that ...") contradicts Paul's representations as to the legitimacy of the shelter. It is also not clear that the opinion letter contradicts Paul's representations that the Seippels

---

107. *See id.* at 44–45.

108. *See id.* at 45–47. *See also* Compl. ¶¶ 82, 142.

109. Compl. ¶ 68.

110. Virginia has no bright line rule distinguishing among statements of existing fact, statements of opinion, and promises as to future events. Instead, courts must look to "[t]he relative knowledge of the parties' dealing, their intentions and all of the surrounding circumstances, which can only be gathered from the evidence." *Tate,* 257 Va. at 83, 508 S.E.2d 597. These are questions of fact, and cannot be resolved on a motion to dismiss.

111. *See* Compl. ¶¶ 66–87, 188.

112. *See, e.g.,* Compl. ¶¶ 66, 80, 84–85. *See Lewis v. Rosenfeld,* 138 F.Supp.2d 466, 478 (S.D.N.Y.2001) (holding that third party's oral misrepresentations were imputed to defendant because plaintiff alleged that third party was "parroting" defendant, and defendant was telling third party what to say to induce plaintiff to invest).

113. *See, e.g.,* RICO Stmt. at 12–22.

114. *See Novak,* 216 F.3d at 312.

115. Sidley Mem. at 18–19.

could rely on the letter to protect against penalties. The letter states that it is "not binding upon the IRS or a court of law," [116] but that is hardly a clear contradiction of Paul's statement. In any case, "whether or not reliance was reasonable is ordinarily a question of fact," [117] and it is not appropriate to decide this question on a motion to dismiss. The motion to dismiss the Seippels' fraud claim against the Sidley Defendants is therefore denied.

### 4. Rescission and Restitution of Fees

The Seippels also seek rescission of their fee agreement with the Sidley Defendants and "restitution or recoupment" of the fees paid under it.[118] Insofar as this claim is based on the Sidley Defendants' alleged "violat[ion of] the applicable rules of professional conduct and standard of care," [119] it merges into the malpractice claim and is time-barred.[120] However, the Amended Complaint also bases this claim on the allegation that "[i]rrespective of the merits of the Opinion Letter that [the Sidley Defendants] rendered to the Seippels, the $21,180 fee that [the Sidley Defendants] charged the Seippels ... is unethically

excessive in violation of, and invalid and unenforceable under [New York and Virginia rules of professional conduct]." [121] This claim is distinct from the malpractice claim, as it does not require any finding of malpractice on the part of the Sidley Defendants.[122]

▉ New York choice of law rules require that the law of the jurisdiction having the greatest interest in the litigation be applied.[123] With regard to this claim, that jurisdiction is New York. Brown & Wood was a New York firm, and Ruble is licensed to practice in New York.[124] New York's interest in regulating the conduct of its attorneys gives it the predominant interest in this matter.[125] "Under New York law, a client has an affirmative cause of action for rescission of [a fee agreement that is invalid under the Code of Professional Responsibility] and restitution or recoupment of legal fees paid in excess of the reasonable amount due to the attorney for services actually rendered." [126] The Seippels have alleged that the Sidley Defendants' fee violated New York's Code of Professional Responsibility Disciplinary Rule 2–106, which forbids excessive fees.[127]

---

116. Brown & Wood Opinion Letter, Ex. C to Declaration of Aaron R. Marcu, counsel to Sidley Defendants, at 7. The Court may consider this document because it is integral to the Amended Complaint, though not attached to it. *See International Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995).

117. *Stratford Group, Ltd. v. Interstate Bakeries Corp.*, 590 F.Supp. 859, 865 (S.D.N.Y.1984).

118. Compl. ¶ 222.

119. *Id.* at ¶ 219.

120. *See supra* Part IV.C.1.

121. Compl. ¶ 218.

122. *Cf. RHI Holdings v. Debevoise & Plimpton*, 209 A.D.2d 344, 345, 619 N.Y.S.2d 4 (1st Dep't 1994) (holding that six-year statute of

limitations, rather than three-year statute applicable to legal malpractice actions, applied to cause of action to recover allegedly excessive fee paid to law firm).

123. *See Krock*, 97 F.3d at 645.

124. Compl. ¶¶ 11–12.

125. *See The Diversified Group, Inc. v. Daugerdas*, 139 F.Supp.2d 445, 453 (S.D.N.Y.2001) ("A state has a paramount interest in regulating the conduct of attorneys licensed to practice within its borders.").

126. *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.*, 20 F.Supp.2d 645, 650 (S.D.N.Y.1998). *See also RHI Holdings*, 209 A.D.2d at 345, 619 N.Y.S.2d 4.

127. *See* New York Code of Prof. Resp., Comp. Codes R. & Regs. tit. 22, § 1200.11 (2004).

Whether a fee is excessive is a question of fact, and cannot be determined on a motion to dismiss.[128] The Seippels have stated a valid claim for rescission and restitution.

▇ Moreover, even if the fee agreement between the Seippels and the Sidley Defendants did not violate the Code of Professional Responsibility, the Seippels may still have a claim for rescission and restitution. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[129] Here, however, the Seippels have alleged that the contract is not enforceable, because of various material omissions by the Sidley Defendants.[130] The Seippels have also alleged affirmative misrepresentations made by the Sidley Defendants, through Paul, to induce them to participate in the COBRA transaction.[131] As discussed above, these allegations are specific enough to pass muster under Rule 9(b). If the Seippels are able to show that the agreement with the Sidley Defendants is unenforceable, because fraudulently induced, then they may recover under a theory of unjust enrichment.[132] The motion to dismiss this claim is therefore denied.

### D. The State Law Claims Against the Deutsche Bank Defendants

#### 1. Breach of Fiduciary Duty

▇ The agreements between the Deutsche Bank Defendants and the Seippels contained New York choice of law clauses.[133] New York requires that courts enforce the parties' selection of New York law in commercial contracts of $250,000 or more.[134] New York law therefore applies to the analysis of whether a fiduciary duty arose from the relationship. The agreements explicitly stated that Deutsche Bank was not acting as a fiduciary to the Seippels.[135] Because contractual disclaimers of fiduciary duty are effective in New York,

---

**128.** *See id.* ("A fee is excessive when, *after a review of the facts*, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.") (emphasis added).

**129.** *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.,* 87 F.3d 604, 610 (2d Cir.1996) (citing *Clark–Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)).

**130.** *See* Compl. ¶ 219.

**131.** *See id.* ¶ 187.

**132.** *See In re Vivendi Universal, S.A.,* No. 02 · Civ. 5571, 2004 WL 876050, at *12 (S.D.N.Y. Apr. 22, 2004) (holding that "the quasi-contract remedy of unjust enrichment may be alleged [despite the existence of a contract] when the validity of the contract is called into question" on grounds of fraud in the inducement). *See also Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1272 (S.D.N.Y.1991) (holding dismissal of unjust enrichment claim was premature, where there was a factual issue as to whether contract was fraudulently induced).

**133.** *See* Foreign Exchange Digital Option Transaction Amended Confirmations ("F/X Confirmations"), attached to 2/4/04 Declaration of Marla Alhadeff, counsel to Deutsche Bank Defendants, in Support of Deutsche Bank Defendants' Motion to Dismiss ¶ 4; Account Agreements between BT Alex Brown and (i) WHS Seneca Knoll Investments, LLC, (ii) WSWP Partners, and (iii) WSWP Virginia Investors, Inc., Exs. 1–3 to 4/15/04 Declaration of Marla Alhadeff, in Further Support of Deutsche Bank Defendants' Motion to Dismiss ¶ 18.

**134.** *See* Gen. Oblig. Law § 5–1401 (McKinney 2001).

**135.** *See* F/X Confirmations ¶ 3 ("Each party represents to the other party [that] the other party is not acting as a fiduciary or adviser to it in respect of this Transaction").

no fiduciary duty can arise from the relationship between the Seippels and Deutsche Bank.[136]

## 2. Inducing Breach of Fiduciary Duty

 The Seippels allege that the Deutsche Bank Defendants knowingly induced and participated in breaches of the fiduciary duties the Sidley and Jenkens Defendants owed to the Seippels as their attorneys. The elements of a claim for inducing breach of fiduciary duty are "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach."[137]

 This claim must be dismissed because the underlying claim of breach of fiduciary duty is time-barred.[138] "Where the primary [breach of fiduciary duty] is barred by the applicable statute of limitations, a claim for aiding and abetting this primary [breach of fiduciary duty] fails to state a claim."[139]

## 3. Fraud

 The Deutsche Bank Defendants' contention that "the fraud claim [against Deutsche Bank] is based solely on alleged omissions," and that the complaint does not allege reliance on any representation by Deutsche Bank in deciding to enter into the COBRA transaction, is simply not true.[140] The Seippels allege that they relied on Paul's misrepresentations, and that those misrepresentations were made "at the behest of" defendants, including the Deutsche Bank Defendants.[141] The Seippels have adequately alleged the nature of Deutsche Bank's involvement in the fraudulent scheme.[142] The fraud claim against the Deutsche Bank Defendants is adequate for the same reason that the claim against the Sidley Defendants was found to be adequate.

## 4. Rescission and Restitution of Fees

The Seippels claim that Deutsche Bank "was unjustly enriched by their receipt of . . . fees that were excessive, unreasonable and improper. Equity and good conscience demand the return of those fees. Accordingly, Plaintiffs are entitled to rescind the agreement to pay Deutsche Bank $600,000 and are entitled to restitution or recoupment of that amount."[143] The Deutsche Bank Defendants argue that this

---

136. *See Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998).

137. *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847–48 (2d Cir.1987) (quotation omitted). The elements of the claim are not materially different under Illinois law, which the Seippels urge the Court to apply. *See Regnery v. Meyers,* 287 Ill.App.3d 354, 364, 223 Ill. Dec. 130, 679 N.E.2d 74 (1997).

138. *See supra* Part IV.C.2.

139. *Geren v. Quantum Chem. Corp.,* 832 F.Supp. 728, 737–38 (S.D.N.Y.1993). *See also Meridien Int'l Bank v. Liberia,* 23 F.Supp.2d 439, 453 (S.D.N.Y.1998). New York courts appear to use the terms 'inducing a breach of fiduciary duty' and 'aiding and abetting a breach of fiduciary duty' interchangeably. *See, e.g., Kaufman v. Cohen,* 307 A.D.2d 113, 124, 760 N.Y.S.2d 157 (1st Dep't 2003) (quoting language from *S & K Sales Co.* regarding elements of 'inducing or participating in breach of fiduciary duty' as elements of 'aiding and abetting breach of fiduciary duty'). Illinois law cited by the Seippels uses the terminology "colludes . . . induces or participates." *Regnery,* 287 Ill.App.3d at 364, 223 Ill.Dec. 130, 679 N.E.2d 74. The precise name given to the claim makes no difference: in every case, a breach of fiduciary duty by another is an element, and the claim cannot survive if that underlying breach is time-barred.

140. Deutsche Bank Mem. at 19–20.

141. *See, e.g.,* Compl. ¶¶ 66, 76, 77, 80.

142. *See, e.g.,* RICO Stmt. at 22–25.

143. Compl. ¶¶ 225–226.

claim must be dismissed because "Plaintiffs acknowledge that they have an express contract with Deutsche Bank." [144] For the reasons discussed earlier in analyzing the Seippels' claim for restitution of fees from the Sidley Defendants, this argument is not persuasive. Because the Seippels have adequately alleged that Deutsche Bank fraudulently induced them to enter into the contract, there is an issue of fact as to whether the contract is enforceable. [145] The motion to dismiss this claim is denied.

## E. Declaratory Judgment

■ The Seippels seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that defendants are liable for interest and penalties that may be assessed by the IRS or Virginia tax authorities as a result of ongoing audits, and for professional fees that may be incurred in connection with those audits. "[A] declaratory judgment is available to resolve a real question of conflicting legal interests. That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. Rather, courts should focus on the practical likelihood that the contingencies will occur." [146] The Seippels have alleged a practical likelihood that these contingencies will occur. [147] Because the Seippels have stated a valid claim of fraud that could, if proved, render defendants liable for these damages, the motion to

dismiss the Seippels' claim for a declaratory judgment is denied.

## F. The Sidley Defendants' Motion to Strike Damages Allegations Relating to Back Taxes, Interest and Professional Fees

As an alternative to their motion to dismiss, the Sidley Defendants move pursuant to Rule 12(f) to strike the Seippels' prayer for damages "to the extent it seeks recovery ... of back taxes, interest and professional fees." [148] The Sidley Defendants argue that these damages are not recoverable as a matter of law.

■ Under Rule 12(f), a court may strike from any pleading an insufficient defense or any other "redundant, immaterial, impertinent, or scandalous matter." [149] A demand for damages that are not recoverable as a matter of law may be stricken. [150] Motions to strike are generally disfavored and will be denied unless it is clear that under no circumstances could the demand succeed. [151] "Moreover, even when the facts are not disputed, several courts have noted that a motion to strike for insufficiency was never intended to furnish an opportunity for the determination of disputed and substantial questions of law." [152]

■ The Sidley Defendants contend that "taxes ... allegedly paid to the government and the interest on those taxes ... are not recoverable as a matter of

---

144. Deutsche Bank Mem. at 22.

145. *See* Compl. ¶¶ 187, 223. *See also supra* note 132.

146. *Associated Indemnity Corp. v. Fairchild Indus., Inc.,* 961 F.2d 32, 35 (2d Cir.1992) (citations and quotations omitted).

147. *See* Compl. ¶¶ 208–209.

148. Sidley Mem. at 21.

149. Fed.R.Civ.P. 12(f).

150. *See Nash v. Coram Healthcare Corp.,* No. 96 Civ. 0298, 1996 WL 363166, at *4 (S.D.N.Y. June 28, 1996) (holding punitive damages not recoverable under ordinary breach of contract claim should be stricken).

151. *See Salcer v. Envicon Equities Corp.,* 744 F.2d 935, 939 (2d Cir.1984), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986).

152. *Id.* (quotation omitted).

law." [153] In support of their motion, the Sidley Defendants cite *Alpert v. Shea Gould Climenko & Casey*,[154] in which the court held that a victim of a fraudulent tax shelter could not recover back taxes or interest paid to the government. The Seippels argue that they are entitled to recover back taxes paid to the government because "they lost legitimate tax savings and deductions by following the Defendants' advice." [155] The *Alpert* court rejected that argument, holding that "the victim of fraud may not recover the benefit of an alternative agreement overlooked in favor of the fraudulent one." [156] The *Alpert* court held that recovery of interest would be a windfall, because "such interest was not damages suffered by plaintiff but rather was a payment to the IRS for his use of the money during the period of time when he was not entitled to it." [157]

■■■ Under *Alpert*, the Seippels could not recover back taxes or interest. However, as noted earlier, Virginia law applies to the Seippels' fraud claim.[158] Other jurisdictions have taken a contrary view to that of *Alpert*, holding that back taxes, interest, or both are recoverable in fraud or malpractice cases.[159] Under Virginia

law, a plaintiff may recover for gains prevented by defendant's fraud, so long as those gains can be "ascertained with reasonable certainty or definiteness." [160] Because it is possible that the Seippels will be able to prove the extent to which defendants' alleged fraud caused them to forego alternative tax shelters with sufficient certainty, the motion to strike the prayer for back taxes is denied.

Virginia courts have not directly addressed the issue of recovery of interest payments. However, Virginia's approach to the 'benefits rule' may be analogous. Under the benefits rule, "[w]hen the Defendant's tortious conduct has caused harm to the plaintiff . . . and in so doing has conferred a special benefit [on the plaintiff], the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable." [161] In this case, defendants argue that the Seippels' recovery should be reduced to reflect the benefit of having had the use of the tax money during the relevant period. Virginia courts, applying the benefits rule, have held that defendants have the burden of proving the extent to which plaintiffs were benefited by their tortious act.[162]

---

153. Sidley Mem. at 22. "Taxes . . . paid to the government" or 'back taxes' here refers to payments to the IRS and Virginia tax authorities for deficiencies on the returns on which the Seippels claimed the COBRA losses. The Seippels seek to recover "tax payments in an amount exceeding $5 million they were promised they would not have to make." Compl. ¶ 163.

154. 160 A.D.2d 67, 72, 559 N.Y.S.2d 312 (1st Dep't 1990).

155. Pl. Opp. Sidley at 21. *See also* Compl. ¶ 163.

156. *Alpert*, 160 A.D.2d at 72, 559 N.Y.S.2d 312.

157. *Id.* (quotation omitted).

158. *See supra* Part IV.C.3.

159. *See, e.g., Eckert Cold Storage v. Behl*, 943 F.Supp. 1230, 1234 (E.D.Cal.1996) (holding that back taxes are recoverable under California law to the extent that plaintiffs can prove that they passed up an alternative shelter, but holding that interest is not recoverable); *Ronson v. Talesnick*, 33 F.Supp.2d 347, 352 (D.N.J.1999) (holding that interest is recoverable under New Jersey law, and noting split of authority).

160. Michie's Jurisprudence of Virginia and West Virginia, Damages, § 41 (2003). *See also Murray v. Hadid*, 238 Va. 722, 732, 385 S.E.2d 898 (1989).

161. Restatement (Second) of Torts, § 920 (1979).

162. *See Lee v. Bell*, 237 Va. 626, 630, 379 S.E.2d 464 (1989).

A blanket prohibition against the recovery of IRS interest . . . permits the tortfeasor to benefit from the presumption that a harmed taxpayer has been or should have been ingenious enough to (1) maintain a sum of money that he would have otherwise had to pay over to the IRS and (2) invest that money in a manner in which he earned interest in an amount comparable to the interest rate charged by the IRS.[163]

Under Virginia law, defendants are not entitled to such a presumption. The extent to which the Seippels can recover the interest on back taxes they paid to the tax authorities is therefore a question of fact.

Moreover, because this presents a disputed and substantial question of law, it is not appropriately decided on a motion to strike. Such "questions quite properly are viewed as determinable only after discovery and a hearing on the merits. To do otherwise would be to run the risk of offering an advisory opinion on an abstract and hypothetical set of facts."[164] Here, not only has there been no development of the facts on this issue, but the parties have not had the opportunity to brief the issue under the applicable law.

█ The Sidley Defendants' motion to strike the prayer for "professional fees" appears to refer only to the fees "allegedly paid [to] advisors . . . to address the ongoing IRS audits."[165] The Sidley Defendants argue that these fees are not recoverable as a matter of law, because "[p]laintiffs themselves admit, and the Brown & Wood Opinion Letter makes clear, that the COBRA transaction contemplated the possibility that Plaintiffs would incur such audit-related expenses."[166] The Seippels have alleged that they engaged in the COBRA transaction in reliance on deliberate misrepresentations as to the risk of audits. Whether that reliance was reasonable, given the statements in the opinion letters, is a question of fact.

It is impossible to say at this stage that the Seippels cannot, as a matter of law, recover back taxes, interest or professional fees to some extent. The motion to strike is therefore denied.

### G. Leave to Amend

The Seippels have requested leave to amend their complaint. In particular, they have requested leave to amend to state a claim for securities fraud, in the event that their RICO claims are found to be barred by the PSLRA.[167]

█ Rule 15(a) provides that the court should grant leave to amend "freely . . . when justice so requires."[168] The Second Circuit has noted that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend. Although the decision to grant leave to amend is within the discretion of the court, refusal to grant leave must be based on a valid ground."[169] Where the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted.[170]

For reasons discussed above, it appears that the Seippels will be able to amend their complaint to plead securities fraud.

163. *Ronson,* 33 F.Supp.2d at 352.

164. *Salcer,* 744 F.2d at 939.

165. Sidley Mem. at 22 (quotation omitted).

166. *Id.*

167. *See* Pl. Opp. Sidley at 22.

168. Fed.R.Civ.P. 15(a).

169. *Hayden v. County of Nassau,* 180 F.3d 42, 53 (2d Cir.1999) (citations omitted).

170. *See Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991).

They are therefore granted leave to do so. It does not appear possible that the Seippels can amend to plead malpractice (or related claims) in this Court, because those claims are time-barred, and the Seippels have already had one chance to amend. However, the Seippels have requested leave to refile those claims in another jurisdiction in which they would not be time-barred. The claims barred by operation of New York's statute of limitations are therefore dismissed with leave to refile elsewhere. It does not appear, however, that the Seippels can amend their pleadings to state a claim for breach of fiduciary duty against Deutsche Bank. That claim is therefore dismissed with prejudice.

## V. CONCLUSION

For the foregoing reasons, the Sidley and Deutsche Bank Defendants' motions to dismiss are granted in part and denied in part. The Seippels' RICO claims are dismissed with prejudice. The Seippels' malpractice, negligent misrepresentation, breach of contract, and inducing breach of fiduciary duty claims are dismissed with leave to refile elsewhere. The Seippels' breach of fiduciary duty claim against the Sidley Defendants is dismissed with leave to refile elsewhere. The Seippels' breach of fiduciary duty claim against the Deutsche Bank Defendants is dismissed with prejudice. The Seippels are granted leave to amend to state a complaint for securities fraud. The Sidley Defendants' motion to strike is denied. The Clerk of the Court is directed to close these motions (docket # 56, 63). A conference is scheduled for September 13 at 4:30.

SO ORDERED.